In the Matter of the Appraisal of
**SHELL OIL COMPANY.**

Supreme Court of Delaware.

Submitted: Feb. 4, 1992.
Decided: May 26, 1992.

Richard L. Sutton, William O. LaMotte, III and Robert J. Valihura, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington (Rory O. Millson (argued), Cravath, Swaine & Moore, New York City, of counsel), for appellants.

Clark W. Furlow, Smith, Katzenstein & Furlow, Thomas P. Preston and John L. Olsen, Duane, Morris & Heckscher and Lawrence C. Ashby, Ashby & Geddes, Wilmington (H. Lee Godfrey (argued), and Kenneth E. McNeil, Susman Godfrey, Houston, Tex., and Edward M. Selfe, Bradley, Arant, Rose & White, Birmingham, Ala., of counsel), for appellees.

Before MOORE, WALSH, JJ., and TAYLOR, Judge (sitting by designation pursuant to Del. Const. art. IV, § 12).

WALSH, Justice:

This is an appeal from a decision of the Court of Chancery in an appraisal action brought pursuant to 8 *Del.C.* § 262. Petitioners below-appellees ("petitioners"), former minority shareholders of respondent below-appellant Shell Oil Company ("Shell"), sought an appraisal of the fair value of Shell's common stock on June 7, 1985, the date shareholders were cashed out at $58 per share. The cash out resulted from a short-form merger effectuated by Shell's 94.6 percent majority stockholder, respondent below-appellant Shell Petroleum, Inc. (f/k/a SPNV Holdings, Inc.) ("Holdings"),[1] as required by a court approved settlement of an earlier class action.

The Court of Chancery determined that the fair value of the shareholders' stock was $71.20 per share at the time of the merger. The court further found that the shareholders were entitled to simple interest at a rate of 10 percent per annum per share. In this appeal, Shell challenges the Court of Chancery's fair value determination and the shareholders cross-appeal the Court of Chancery's award of simple interest rather than semi-annual compounding of interest.

We have carefully reviewed the record in this case and have concluded that there is sufficient evidence to support the findings of the Court of Chancery. Accordingly, the decision of the Court of Chancery is affirmed.

I

The events leading up to the privatization of Shell and the extensive litigation it spawned are described in detail elsewhere. *See Joseph v. Shell Oil Co.*, Del.Ch., 482 A.2d 335 (1984) (tender offer materials failed to satisfy disclosure requirements); *Joseph v. Shell Oil Co.*, Del.Ch., C.A. Nos. 7450 and 7699–NC, Hartnett, V.C. (April 19, 1985) (approving proposed settlement of class action); *Selfe v. Joseph*, Del.Supr., 501 A.2d 409 (1985) (affirming class action settlement); *Simon v. SPNV Holdings,*

*Inc.*, Del.Ch., C.A. No. 8395–NC, Hartnett, V.C. (Oct. 28, 1987; reversed Nov. 2, 1987) (denying defendant's motion to dismiss claims of material nondisclosure in merger materials); *Smith v. SPNV Holdings, Inc.*, Del.Ch., C.A. No. 8395–NC, Hartnett, V.C., 1989 WL 44049 (April 26, 1989) (denying defendant's motion for summary judgment on disclosure claims); *Smith v. Shell Petroleum, Inc.*, Del.Ch., C.A. No. 8395–NC, Hartnett, V.C., 1990 WL 84218 (June 19, 1990) (holding that defendant failed to adequately disclose all material facts prior to cash-out merger); *In the Matter of the Appraisal of Shell Oil Co.*, Del.Ch., C.A. No. 8080, Hartnett, V.C., 1990 WL 201390 (Dec. 11, 1990) (hereinafter *Appraisal of Shell*, slip op.); *Shell Petroleum, Inc. v. Smith*, Del.Supr., 606 A.2d 112 (1992) (affirming the Court of Chancery's award of damages for material misstatements in connection with the cash-out merger). Much of this background is only tangentially related to the issues raised in this appeal. We will therefore summarize it briefly.

Prior to the merger which precipitated these proceedings, Shell was a publicly traded oil and gas company with substantial assets throughout the world. It was, however, only one component of a much larger natural resources conglomerate, Royal Dutch Petroleum Company ("Royal Dutch"). Royal Dutch controlled, either directly or through subsidiary holdings, over 70 percent of Shell's outstanding shares.

During the early 1980's, Royal Dutch began considering the acquisition of Shell's minority shares. To that end, it retained in 1984, the investment banking firm of Morgan Stanley & Co. ("Morgan Stanley") to prepare an estimate of the value of Shell stock. Morgan Stanley opined that a share of Shell stock was worth $53. Royal Dutch thereafter proposed to Shell's Board of Directors that Shell merge with Royal Dutch for a consideration of $55 cash for each share of Shell stock.

---

1. Because their interests are the same, Shell and Holdings will hereafter be referred to collective-

ly as "Shell."

In response to this offer by its majority stockholder, Shell's board appointed an independent committee comprised of six outside directors to consider the offer. The committee retained the firm of Goldman Sachs & Co. ("Goldman Sachs") as its financial advisor and commissioned a study of the fair value of Shell stock. In the resulting study, Goldman Sachs concluded that $80 to $85 per share was a range of "high confidence" and that $70 per share was the lowest price it could say was fair. The committee thereupon recommended that the Shell Board reject the Royal Dutch offer.

Royal Dutch then commenced a tender offer for any and all shares at a price of $58 per share with the announced intention of effectuating a freeze-out merger after completion of the offer. It completed the offer in 1984, increasing its holdings in Shell to 94.6 percent. However, Royal Dutch's planned short-form merger was enjoined during the pendency of litigation which continued to call into question the propriety of the tender offer. *See Selfe v. Joseph*, Del.Supr., 501 A.2d 409 (1985). As a result of the decision in *Joseph*, Royal Dutch was required to pay an additional $2 per share to all those shareholders who had tendered into its offer as well as increase the merger consideration from $58 to $60 for the benefit of shareholders not electing the appraisal remedy at the back-end of the transaction. *See Joseph*, 501 A.2d at 410.

## II

After the merger was complete, 1,005,081 shares qualified for appraisal under 8 *Del.C.* § 262. The Court of Chancery conducted an appraisal hearing which lasted seven days. The parties offered extensive evidence, primarily through competing experts, respecting the value of Shell shares as of the date of the merger.

Petitioners' chief witness was Kurt Wulff ("Wulff"), a chemical engineer and graduate of the Harvard Business School. Wulff's experience in the oil and gas field spanned twenty years and included financial analysis and asset valuation. To arrive at a fair value for Shell shares, he employed three different approaches. First, he offered what he called a Present Value of Equity Analysis. Essentially, this approach entailed a determination of the liquidation value of Shell's upstream assets, such as oil and gas reserves and exploratory acreage, and the valuation of Shell's downstream assets, such as its Oil Products and Chemical Products divisions, on a return on investment basis. Wulff concluded that under this method a share of Shell stock on June 7, 1985 was worth $100 on a buyer's tax cost basis and $89 on a seller's tax cost basis.

Second, Wulff offered what he termed a Comparative Deal market Analysis. This methodology involved comparing the results yielded by Wulff's Present Value of Equity Analysis with share prices reflected in similar transactions in the oil and gas industry, such as DuPont's purchase of Conoco and Chevron's acquisition of Gulf Oil. After comparing the transaction at issue here with seventeen other industry acquisitions, Wulff fixed the fair value of a share of Shell stock on the merger date at approximately $106.

Wulff's final valuation standard he referred to as a Trading Market Analysis. This inquiry rests on the assumption that the stock of corporations such as Shell trade on the open market at a discount from their fair value. To compensate for the effect of merger speculation, Wulff constructed a hypothetical price he believed Shell would have traded for on the open market in 1985 had no offer been made in 1984. To this price he added a premium calculated from the premiums over market price obtained by shareholders when other oil companies, such as Gulf and Conoco, were acquired. Depending on which comparable was selected, Wulff found a range in value from $92 to $143 per share.

Shell's expert, Morgan Stanley, also took a three pronged approach in its valuation of Shell. It first offered a liquidation study using a discounted cash flow of Shell's upstream assets and an estimate of the value of Shell's downstream assets based largely on a trading market analysis.

This methodology yielded a valuation of $57.50 per share at the time of merger.

Next, Morgan Stanley offered what it called a Merger Market Analysis. This technique is similar to Wulff's Comparative Deal Market Analysis in that it involved a comparison of Shell to other similar companies which had experienced acquisition. Morgan Stanley concluded that this method suggested a fair value of $60 per share.

Finally, Morgan Stanley offered its own Trading Market Analysis based on a calculation of what Shell stock would have traded for had there been no merger offer. The quest here was to determine an "unaffected stock price." This was done simply by comparing the price of Shell stock to other domestic and international oil and gas companies which had not gone through change of control or restructuring transactions in the relevant time period. The conclusion of this analysis was that Shell was worth $43 to $45 per share on June 7, 1985.

### III

In an extensive opinion, the Vice–Chancellor addressed the merits and deficiencies of the competing value studies. He found neither of the trading market analyses particularly convincing. He assigned no weight to Wulff's Trading Market Analysis due to numerous flaws in the method used to arrive at the price range of $92 to $143. Of particular significance, the court found that Wulff improperly relied, as a basic premise, on the proposition that Shell stockholders were entitled to a premium over Shell's value. *Cf. Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1144 (1989). As for Morgan Stanley's Trading Market Analysis, the court concluded that Morgan Stanley's finding that Shell stock in June of 1985 would have experienced no change from its January, 1984 price notwithstanding a substantial rise in the market price of other oil stocks during the same period, was "highly illogical." This rejection was consistent with the court's earlier finding that Shell was "a superior company to most of those studied by Morgan Stanley and should have been priced above the median." *Appraisal of Shell,* slip op. at 55. The court therefore afforded Morgan Stanley's Trading Market Analysis very little weight.

The Vice Chancellor also assigned little weight to the proffered techniques based on comparing the Shell transaction to other similar "deals." Although he found Wulff's Comparative Deal Market Analysis to be "an acceptable method for evaluating a corporation like Shell," Wulff's conclusions were found to be "of little use" because of a number of "inconsistencies and biases in favor of the party paying for the analysis." *Id.* at 32. Specifically, the court viewed Wulff's reliance on the buyer's tax cost basis of his Present Value of Equity Analysis to be a fatal flaw. The Vice Chancellor therefore concluded that Wulff's Deal Market comparisons were "less valid" than his Present Value of Equity Analysis.

Morgan Stanley's Merger Market Analysis fared little better. The Vice Chancellor found, *inter alia,* that Morgan Stanley's calculations were often too "pessimistic" and that Morgan Stanley failed to accord sufficient weight to Shell's more valuable domestic reserves, as opposed to its less valuable foreign reserves. The court concluded that the Morgan Stanley's Merger Market Analysis was "less valid" than its Liquidation Value Analysis.

As to the parties' liquidation value techniques, the court found both to be valid methodologies but somewhat flawed in their application. The court characterized Wulff's Present Value of Equity Analysis as "a sufficiently accurate and accepted technique to be entitled to considerable weight in determining the fair value of the shares." *Id.* at 18. However, it noted numerous instances where Wulff made assumptions "based on acceptable, but speculative, factors" and implied that many of these assumptions were "justifiable," yet "optimistic."

Similarly, the court found Morgan Stanley's Liquidation Analysis to be an acceptable valuation technique although it had a tendency toward understatement. The court commented that "in preparing its estimate [Morgan Stanley] obviously made

hundreds of assumptions as to the value of a particular asset. In most instances it chose the lower, rather than the higher, value.... It is therefore clear that Morgan Stanley's Liquidation Analysis is substantially flawed." *Id.* at 53.

After reviewing the valuation evidence in its effort to fix the fair value of Shell stock *on the date of the merger*, the Court of Chancery expressed some dissatisfaction with the lack of objectivity in the presentations. The court noted that it was "obvious ... that the dynamics of this litigation and the economic interest of the parties contributed to the wide differences in the expert opinions" but the court nonetheless believed it was limited "to the record as established by the parties." *Id.* at 80. On balance, however, the court accepted Wulff's Present Value of Equity Analysis ($89) and *Morgan Stanley's Liquidation Value Analysis* ($57.50) as the most credible methodologies.

The court finally settled on Wulff's Present Value of Equity Analysis as entitled to the greatest weight. However, because of certain flaws in Wulff's data which tended to skew the result upward, the court applied a twenty percent discount to the $89 figure, producing a fair value for Shell stock of $71.20.

The court gave no explanation for its choice of twenty percent as a discount factor. However, it did conclude that portion of its opinion with the following sentence:

> For purposes of information only, it is noted that this figure [$71.20] is not far from the $70 per share "low" value arrived at by Goldman Sachs in 1984 when it prepared an estimate of value for the Independent Committee of Shell appointed to consider the offer of Holdings.

*Id.* at 83. The court then awarded the dissenting shareholders simple interest at a rate of 10 percent per year.

In this appeal both parties express dissatisfaction with the Vice Chancellor's ruling. Shell argues that the $71.20 finding is erroneous in three respects. First, it contends the court's valuation determination is essentially a liquidation finding. Second, it claims the trial court erred by giving no weight to the market and earnings values of Shell shares. Finally, Shell argues that, to the extent either measure of value is relevant, the court erred in selecting Wulff's Present Value of Equity Analysis over Morgan Stanley's Liquidation Value Analysis in light of the court's specific findings which seemingly favor Morgan Stanley's approach.

Petitioners cross appeal a different aspect of the Vice-Chancellor's decision. They contend the court erred in awarding simple rather than compound interest because the only evidence in the record concerning interest supported compounding on a semi-annual basis. They argue it was error for the court to make a finding for which there was no record support.

### IV

■ The legal standards which govern an appraisal of minority shares after a freeze-out merger are not disputed by the parties. Once a shareholder perfects his right to appraisal under 8 *Del.C.* § 262(d), the Court of Chancery is required to determine the "fair value" of his shares, "exclusive of any element of value arising from the accomplishment or expectation of the merger," by considering "all relevant factors." 8 *Del.C.* § 262(h). Fair value, in an appraisal context, measures "that which has been taken from [the shareholder], *viz.*, his proportionate interest in a going concern." *Tri–Continental Corp. v. Battye,* Del.Supr., 74 A.2d 71, 72 (1950). In the appraisal process the corporation is valued "as an entity," *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1144 (1989), not merely as a collection of assets, *Bell v. Kirby Lumber Corp.,* Del.Supr., 413 A.2d 137 (1980), or by the sum of the market price of each share of its stock, *Chicago Corp. v. Munds,* Del.Ch., 172 A. 452 (1934). Moreover, the corporation must be viewed as an on-going enterprise, occupying a particular market position in the light of future prospects. *See Application of Delaware Racing,* Del.Supr., 213 A.2d 203 (1965).

The appraisal quest at the Court of Chancery level admits of a broad latitude. As this Court ruled in *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983), the parties to an appraisal action must be afforded the opportunity to present evidence of fair value consisting of "any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Id.* at 713. Thus, the scope of the Chancellor's inquiry into fair value is limited only by the appraisal statute's express exclusion "of any element of value arising from the accomplishment or expectation of the merger," 8 *Del.C.* § 262(h), and the Delaware Rules of Evidence. *Weinberger*, 457 A.2d at 713.

At the appellate level, when this Court reviews a Court of Chancery determination pursuant to Section 262, we impart a "high level of deference" to that court's findings. *Kahn v. Household Acquisition Corp.*, Del.Supr., 591 A.2d 166, 175 (1991). Recognizing that the Court of Chancery, over time, has developed an expertise in cases of this type, we will accept the court's findings if supported by the record and the product of an orderly and logical deductive process. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671 (1972). We will reverse those findings only when they are clearly wrong and the doing of justice requires us to do so. *Id.*

Shell first argues that the Court of Chancery erred by according 100 percent weight to Wulff's Present Value of Equity Analysis. It claims this was improper because that analysis, in effect, reflected a liquidation value, contrary to Delaware law, which precludes the use of liquidation value as the sole measure of the fair value of appraised shares. *See Bell v. Kirby Lumber Corp.*, Del.Supr., 413 A.2d 137 (1980). As Shell interprets the court's findings, the Vice Chancellor selected the result yielded by one valuation method, to the exclusion of other approaches and then arbitrarily discounted that value to account for perceived defects in the underlying study. Since Wulff's Present Value of Equity approach is premised on the value of

Shell stock it remains, even when discounted, the argument runs, a liquidation approach which ignores "going concern" value.

We believe this argument mischaracterizes the trial court's findings. Our review of the court's opinion suggests that while the Vice Chancellor gave "considerable weight" to Wulff's Present Value of Equity Analysis he did not accept it, at face value, as a liquidation study. *See Appraisal of Shell*, slip op. at 62. Although the court considered the Present Value of Equity technique to be a "variation" of Morgan Stanley's Liquidation Value Analysis, it did not conclude that Wulff's technique produced a liquidation value.

Even if it be assumed, *arguendo*, that Wulff's Present Value of Equity Analysis is a thinly disguised liquidation study, it was considered as merely part of the total body of valuation evidence presented. At trial, the court was offered six valuation techniques, three from each side and it made discriminating judgments concerning them. As previously noted, it found that Wulff's Present Value of Equity Analysis, "although seriously flawed, must be given considerable weight." It further determined that Wulff's Comparative Deal Market Analysis because of a number of inconsistencies was "entitled to less consideration in determining the fair value of Shell's stock than is petitioner's Present Value of Equity Analysis." And finally, it found Wulff's Trading Market Analysis to be "entitled to no weight."

As for Shell's evidence, the court found Morgan Stanley's Liquidation Value Analysis to be "substantially flawed" but concluded that it was one of "the two most creditable methodologies presented." It described Morgan Stanley's Merger Market Analysis as flawed and "less valid than [Morgan Stanley's] Liquidation Value Analysis." Finally, the court concluded that the result obtained from Morgan Stanley's Trading Market Analysis was "highly illogical" and was therefore "less valid than is its Liquidation Value Analysis."

Far from relying solely on Wulff's Present Value of Equity Analysis, the Vice

Chancellor credited, albeit in varying degrees, each technique offered except Wulff's Trading Market Analysis, which he rejected because of its premise that Shell stock should command a premium over market value. In discounting the Present Value of Equity result, the court was recognizing, tacitly at least, that Shell's evidence, which tended to undervaluation, was entitled to some consideration. When so viewed, the court's final figure of $71.20 is clearly supportable and not the product of a liquidation analysis alone.

■ Shell also argues that the Vice Chancellor's selection of a discount factor was arbitrary. We do not agree. The parties had presented reams of evidence on valuation, most of which was biased to favor the position of the presenter. The competing "bottomline" valuation figures were poles apart. Unless the court slavishly adopted the position of one party, the ultimate determination of value, of necessity, was to be selected from a broad range of values. Here the final value chosen ($71.20) is very close to the mid-way mark between the two values the court found to be most credible, $89.00 (Present Value of Equity) and $57.50 (Morgan Stanley's Liquidation Value).

■ The trial court's selection of $71.20 per share was also verified by comparison with another view not directly tendered by the parties. The Goldman Sachs opinion, prepared in 1984 for Shell's Independent Committee, fixed $70 as at the low end of the range of fairness.[2] That independent assessment imparted an inference of reasonableness to the court's finding. When a court is faced with a lack of reliable direct evidence of value, or when doubt exists as to the accuracy of its findings, it is appropriate for the court, as a fact-finder, to test its conclusions against other evidence in the record before it. *Kahn*, 591 A.2d at 175. Given our standard of review, we cannot say the trial court's resulting conclusion was not the product of an orderly and logical deductive process.

■ Shell next argues that the trial court erred by giving no weight to the trading value of Shell's stock. It contends that instead of totally rejecting Morgan Stanley's Trading market Analysis, the court should have adjusted the input to that analysis in order to reach a fair result.

Initially, we note that the Vice Chancellor considered substituting data from other models into Morgan Stanley's Trading Market Analysis. However, it concluded that, in this case, that device was "not an acceptable alternative ... because of the difficulty of interchanging data from differing models." *Appraisal of Shell* at 82. Given our standard of review and the Court of Chancery's long-earned expertise in these matters, we cannot say this conclusion was clearly wrong. At any rate, Shell's argument mischaracterizes the court's findings. The Vice Chancellor did not "totally reject" Morgan Stanley's Trading Market Analysis. It simply found its result to be "highly illogical" and that it was "less valid" than the Liquidation Value Analysis. As we stated above, it is clear that the trial court relied on almost all of the evidence offered, including Morgan Stanley's Trading Market Analysis. Again, we cannot say that the court's treatment of that analysis was improper.

■ Finally, Shell contends the trial court erred by according any weight to Wulff's Present Value of Equity Analysis since that technique is not "generally accepted in the financial community," as required by our decision in *Weinberger*, 457 A.2d at 713. As a corollary to this argument it asserts that the trial court erred in favoring Wulff's equity analysis to Morgan Stanley's much sounder valuation study. We disagree.

This argument is somewhat disingenuous. In essence, Shell claims that a method of valuation it labels "liquidation analysis," is not generally accepted in the financial community, while at the same time tendering its own liquidation analysis. As we noted above, Wulff's Present Value of Equity approach consisted of determining the liquidation value of Shell's upstream

---

**2.** This opinion is contained in the record to this proceeding.

assets and the return on investment value of Shell's downstream assets. The trial court specifically determined this to be an acceptable valuation technique and indeed noted that this approach was "really a variation of the Liquidation Analysis used by [Morgan Stanley]."

▮▮ Liquidation value is one factor relevant to a fair value inquiry and an acceptable technique, with others, upon which the Court of Chancery can rely. *See Kirby Lumber*, 413 A.2d at 142–3. Liquidation value cannot, however, be viewed as a substitute for, or interchangeable with, fair value. We do not view Wulff's technique as a pure liquidation value analysis, however, because it entailed a consideration of cash flow characteristics, future growth potential and industry recognition of the strength of Shell's downstream assets. These considerations point to more than just the reflective value of Shell's physical assets. Nothing in the record suggests that the trial court's decision to accept a method of valuation so similar to Shell's own plainly acceptable method was clearly wrong. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

Shell also argues that specific findings of the trial court regarding the relative persuasiveness of the evidence required preference of Morgan Stanley's liquidation value technique. It claims that the trial court's findings favored Morgan Stanley's valuation of Shell's reserves and exploratory acreage, in contrast to what it claims is a lack of any findings regarding Wulff's valuation of Shell's downstream assets. Shell argues that, given the implications of these findings (and lack thereof), it was error for the court to totally reject Morgan Stanley's valuations.

We find this argument to be unpersuasive in two respects. First, the trial court clearly gave at least some weight to each of Morgan Stanley's techniques. Second, the argument ignores our standard of review.

▮▮ The trial court made numerous conclusions as to the acceptability and weight of all the evidence presented. It also made specific findings comparing the persuasiveness of the various techniques. Even if we were to conclude that the court should have favored Morgan Stanley over Wulff, we would not reverse the trial court on that ground alone because the initial choice is not ours to make. The discretion to weigh the evidence belongs to the Court of Chancery with our review one of abuse of that discretion. *Delaware Racing*, 213 A.2d at 207. In this case, each party's valuation evidence was replete with deficiencies and so susceptible to bias that indiscriminate endorsement of either would have been indefensible, even though technically supported by the record. As Shell's primary expert rather candidly admitted at trial, "Valuation is an art rather than a science." So too is the weighing of evidence in the appraisal process. More than anything else, this emphasizes the broad discretion which the Court of Chancery must have in fixing values. The Vice Chancellor's conclusions are amply supported by the record and the product of an orderly and logical deductive process. We therefore decline to disturb them.

### V

Petitioners have also appealed from the Vice Chancellor's awarding of simple interest because the record contains no evidence to support such an award. They contend that both experts who testified on the interest question adopted a compounding approach.

▮▮ The decision to award simple or compound interest at a particular rate is within the sound discretion of the Court of Chancery. 8 *Del.C.* § 262(i); *Rapid–American Corp. v. Harris*, Del.Supr., 603 A.2d 796, 807 (1992). Of course, an award made arbitrarily or capriciously would be an abuse of that discretion. *Pitts v. White*, Del.Supr., 109 A.2d 786, 788 (1954).

▮▮ In the present case, Shell's expert, Robert Case, of Morgan Stanley, espoused an interest rate of 7.7 percent while Petitioners expert, John Beyers, testified that the interest rate should be 10 to 10½ percent compounded semi-annually. Although the parties are now in disagreement over

whether Case also recommended a compounding of interest, the record reflects that Case's ultimate position was at least neutral on the question. The Petitioners did not argue in the trial court that there was no record support for the award of simple interest and, indeed, the Vice Chancellor reviewed Case's testimony as reflecting a position in favor of "7.6% to 7.7%, simple interest." *Appraisal of Shell*, slip op. at 84. Although the Vice Chancellor found Case's testimony "less credible" than Beyers' because he had earlier opined in favor of a semi-annual compounded interest rate, it was clearly within his discretion to accept Case's recommendation of simple interest while at the same time fixing the interest rate near the figure recommended by Beyers.

In view of the trial court's opportunity to hear the expert testimony and evaluate the credibility and demeanor of the witnesses, we are not inclined to disturb the discretion exercised here in the awarding of simple interest. *Rapid–American* at 809.

## VI

█ Although our affirmance of the Court of Chancery's appraisal determination resolves the merits of this appeal, we take the occasion to comment upon a recurring theme in recent appraisal cases—the clash of contrary, and often antagonistic, expert opinions on value. The presentation of widely divergent views reflecting partisan positions in appraisal proceedings adds to the burden of the Court of Chancery's task of fixing value. Such extremes may result in the court's rejection of both opinions in favor of a middle position. *See, e.g., Kahn v. Household Acquisition Corp.*, 591 A.2d at 172. As the trial court noted in this case: "one thing is clear from the evidence in this trial whether consciously or unconsciously, the opinions expressed by the expert witnesses significantly reflected the desires of their clients." *Appraisal of Shell*, slip op. at 13. We impute no impropriety to the participants in this or other appraisal litigation in their efforts to advance their respective positions. That is to be expected in an adversarial system. But

if the Court is limited to the biased presentation of the parties, it is often forced to pick and choose from a limited record without the benefit of objective analysis and opinion. To compensate for this handicap, the Court of Chancery should consider, in a proper case, appointing its own expert witness.

Apparently, no Delaware Court has ever appointed a neutral expert witness upon its own initiative. However, federal courts have not hesitated to make such appointments. Those courts derive their authority to do so from their inherent power and from the express language of Rule 706 of the Federal Rules of Evidence. The Advisory Committee to the federal rules has noted that "[t]he inherent power of a trial judge to appoint an expert of his own choosing is virtually unquestioned." Fed. R.Evid. 706 advisory committee's note. The Third Circuit Court of Appeals has also noted that "the inherent power of a trial judge to appoint an expert of his own choosing is clear." *United States v. Green*, 3rd Cir., 544 F.2d 138, 145 (1976).

█ While the Court of Chancery rules do not contain a parallel to Federal Rule 706, this Court has held that even in the absence of a parallel federal rule, the spirit and purpose of the federal rules have always been within the inherent power of our courts. *See Cebenka v. Upjohn Co.*, Del. Supr., 559 A.2d 1219, 1225 (1989). Accordingly, we believe that the Court of Chancery has the inherent authority to appoint neutral expert witnesses. There is, of course, no requirement that the court do so. For example, the court need not appoint an expert when "additional experts would ... add more divergence and opinion differences." *Georgia–Pacific Corp. v. United States*, 640 F.2d 328, 334, 226 Ct.Cl. 95 (1980). The procedural steps mandated by Federal Rule 706 offer helpful guidelines where such an appointment is contemplated.

Federal Rule 706 requires the court to "enter an order to show cause why expert witnesses should not be appointed." Fed. R.Evid. 706(a). The order to show cause may be entered on the court's own initia-

tive or on the motion of any party. *See Lightfoot v. Walker*, S.D.Ill., 486 F.Supp. 504, 506 (1980). The expert should be appointed sufficiently in advance of trial as to permit opportunity for hearings on the appointment, consent of the expert, notification of duties, research by the expert, and a communication by the expert to the parties informing them of his findings.

The selection of the expert is solely within the discretion of the trial judge. The trial judge may appoint an expert of his own choosing or seek a list of nominations from the parties. *See Gates v. United States*, 10th Cir., 707 F.2d 1141, 1144 (1983). Once an expert has been retained by the Court of Chancery, the court should communicate with the expert in writing, filing a copy of the correspondence with the clerk or at a conference in which the parties have an opportunity to participate. *See* Fed.R.Evid. 706(a). Appellate review of the trial court's appointment of an expert or lack thereof proceeds under an abuse of discretion standard.

The court appointed expert is subject to the same standards which govern other expert witnesses under the Delaware Rules of Evidence. The expert must advise the parties of all findings and submit to depositions. Once trial commences, it is incumbent upon the trial judge to arrange for the court's expert witness to testify if neither party calls him as a witness. The court's expert must be subject to cross-examination by both parties, even if one party chose to call him as its witness. Finally, the court's expert should be reasonably compensated by the parties in such proportion and at such intervals as the trial court determines.[3]

We do not mandate the use of court appointed experts in any case, leaving such determination to the discretion of the trial judge, but we believe the time has come for the Court of Chancery to avail itself of such a practice whenever it believes that a more objective presentation of evidence is required, particularly in valuation matters. Finally, we suggest that the Court of Chancery consider the adoption of a rule, modeled after Federal Rule 706, which will implement its inherent authority in this area.

---

3. While we express the hope that the use of such an expert will bring greater reason and clarity to the appraisal process, nothing we say here should be construed as requiring the trial court to accept the findings, conclusions or opinions of that expert. Such an appointment has no effect whatever in limiting the Court of Chancery's broad discretion in fixing fair value of corporate stock in an appraisal action.