2008 UT 77

**William BORGHETTI; Michelle Borghetti; La Famiglia Borghetti, LLC; La Dozzina Sporca, LLC; and Campus Pipeline, Inc., Plaintiffs, Appellants, and Cross–Appellees,**

v.

**SYSTEM & COMPUTER TECH, INC., a corporation; Thomas Lewis, Jr.; Darin Gilson; Chad Muir; Fred Harmon; David Gardner; Eric Haskell; Michael Chamberlain; David Murray; Andy Cooley; Scott Doughman; John Dunn; Tyler Thatcher; Thomas Weisel & Partners; SunGard/Sct, Inc.; Oak Investment Partners; Bendinger, Crockett,**

---

**40.** *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966).

Peterson, & Casey, a professional corporation; Jeffery S. Williams; Does 1 to 100, Inclusive; David Peterschmidt; Allen Friedman; and Fred Harman, Defendants, Appellees, and Cross–Appellants.

No. 20070513.

Supreme Court of Utah.

Nov. 7, 2008.

Rehearing Denied Jan. 7, 2009.

Curtis L. Wenger, Salt Lake City, Martin Stanley, Santa Monica, CA, for plaintiffs.

John A. Pearce, Andrew H. Stone, Mark D. Tolman, Salt Lake City, for defendants System & Computer Technology, Inc.; Thomas K. Lewis, Jr.; Darin Gilson; Chad Muir; Fred Harmon; David Gardner; Eric Haskell; Michael Chamberlain; David Murray; Andy Cooley; Scott Doughman; John Dunn; Tyler Thatcher; Thomas Weisel & Partners; Sunguard/SCT, Inc.; Oak Investment Partners.

Stuart H. Schultz, Philip R. Fishler, Byron G. Martin, Salt Lake City, for defendants Jeffery S. Williams; Bendinger, Crockett, Peterson & Casey.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶1 System & Computer Technology, Inc. ("S & C Tech.") merged with Campus Pipeline, Inc. ("Campus Pipeline") when S & C Tech. purchased Campus Pipeline for an amount less than Campus Pipeline's preferred shareholders' liquidation preference. Campus Pipeline's common shareholders received nothing in the merger, and their shares were cancelled. William Borghetti, one of Campus Pipeline's common shareholders, and other common shareholders (collec-

tively, "Borghetti") sued S & C Tech. and others, alleging fraud, breach of fiduciary duty, and unjust enrichment. Borghetti also sued a law firm, Bendinger Crockett Peterson & Casey, P.C., as well as one of its individual attorneys, Jeffery Williams ("Bendinger Crockett"), in malpractice for failing to inform him of the 120–day deadline for filing a Delaware appraisal action. The district court granted summary judgment to all defendants, holding that Borghetti failed to raise a genuine issue of material fact as to whether he suffered damages. The court reasoned that because Borghetti could not show that Campus Pipeline was worth more than the liquidation preference, his shares had no value in a merger and therefore he suffered no damages. While we affirm as to the malpractice claim, we reverse as to the claims against S & C Tech. because the district court failed to consider rescissory damages, which in this case are the value of Borghetti's shares had the merger not taken place.

## BACKGROUND

¶ 2 William Borghetti was a founder and shareholder of common shares in Campus Pipeline, a software company that provided services to college campuses. In 1998, Campus Pipeline sold sixty percent of its common shares to S & C Tech. As a result of the sale, S & C Tech. obtained a controlling interest in Campus Pipeline. In 1999, and again in 2000, Campus Pipeline sold preferred shares to S & C Tech. and other outside investors in exchange for capital contributions of over $80 million. Under the terms of the preferred shares sale, preferred shareholders received a "liquidation preference," which entitled them to receive the first $80.8 million if Campus Pipeline were purchased or liquidated.

¶ 3 Following the bursting of the "internet bubble" in 1999 and 2000, Campus Pipeline struggled financially. While Campus Pipeline had working capital and was not bankrupt, it was losing money every quarter, and company officers believed that Campus Pipeline needed to merge with or purchase another company to strengthen its position in the market. Thus, Campus Pipeline began exploring merger and acquisition options with at least twenty-five companies, including S & C Tech.

¶ 4 In 2002, Campus Pipeline accepted a purchase offer from S & C Tech. in the amount of $42 million, which was the highest of several offers it had received. The purchase of Campus Pipeline by S & C Tech. resulted in the merger of the two companies and triggered the preferred shareholders' $80.8 million liquidation preference. Borghetti and other common shareholders opposed the merger, but, because they were in the minority, they could not prevent the transaction. Because Campus Pipeline was sold for less than the liquidation preference, the common shareholders, including Borghetti, received nothing in the resulting merger, and their shares were cancelled.

¶ 5 After receiving notice of the merger, Borghetti consulted with Jeffery Williams, an attorney with the law firm Bendinger Crockett, about the possibility of pursuing a Delaware appraisal action. Although Williams and Borghetti had numerous communications and meetings, they dispute whether Borghetti ever retained Bendinger Crockett as counsel for the purpose of pursuing an appraisal action to determine the fair value of his shares. Borghetti alleges that Bendinger Crockett failed to inform him of the 120–day deadline for filing an appraisal action. Neither Borghetti nor Bendinger Crockett commenced an appraisal action before the expiration of the 120–day deadline.

¶ 6 Borghetti sued Bendinger Crockett for legal malpractice. Additionally, he sued S & C Tech., members of Campus Pipeline's board of directors, and others for fraud, breach of fiduciary duty, and unjust enrichment.

¶ 7 The value of Borghetti's common shares that were cancelled in the merger is important to the measure of damages for each of Borghetti's claims. And, critical to determining the value of Borghetti's common shares, is an assessment of the value of Campus Pipeline as a whole. Thus, the value of Campus Pipeline was a crucial issue in the proceedings. All parties submitted expert testimony of Campus Pipeline's worth.

Thomas Wiesel, an appraiser hired by Campus Pipeline prior to the merger, testified that, based on 2003 revenue, the value of Campus Pipeline was within the rather expansive range of $200,000 and $58.9 million. Bendinger Crockett's appraisal expert assessed the fair value of Campus Pipeline to be $35 million, and S & C Tech.'s appraiser valued it at just over $36 million. Borghetti's expert, Avner Kalay, determined that the value of Campus Pipeline was between $63.6 million and $72.9 million. Despite the differences in values, all experts placed Campus Pipeline's value at significantly less than the preferred shareholders' $80.8 million liquidation preference.

¶ 8 After the close of discovery, all defendants filed motions for summary judgment, asserting that, because Campus Pipeline was sold for less than the liquidation preference, Borghetti's shares were valueless, and he could not succeed on any of his causes of action.

¶ 9 In March 2006, after the parties' motions for summary judgment were filed, Borghetti submitted an affidavit of the value of his shares from his valuation expert, Avner Kalay (the "Kalay affidavit"). Using the "Black–Scholes" method of valuation, Kalay opined that, at the time of the merger, Borghetti's shares were worth between $4.2 million and $6.7 million. The "Black–Scholes" valuation method is a Nobel Prize-winning, option-pricing theory. While it is accepted as a method to value options to purchase shares in a leveraged company, the parties dispute whether the Black–Scholes method is appropriate for valuing common shares. All defendants moved to strike the Kalay affidavit.

¶ 10 The district court granted summary judgment in favor of all defendants, ruling that there was no issue of material fact as to damages. It held that because none of the experts valued Campus Pipeline at more than the $80.8 million liquidation preference, Borghetti could not prove that his shares had value and, therefore, he could not prove damages. Consequently, his claims for malpractice, fraud, breach of fiduciary duty, and

unjust enrichment all failed. The district court denied the defendants' motion to strike the Kalay affidavit, holding that because Borghetti suffered no damages and his claims were therefore dismissed, the issue was moot.

¶ 11 Borghetti appeals, alleging that the valuation methods employed by the district court were incorrect and that the Kalay affidavit raised an issue of a material fact as to damages. S & C Tech. cross-appeals, arguing that the Kalay affidavit should not have been admitted as evidence. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (Supp.2008).

## STANDARD OF REVIEW

¶ 12 The district court granted summary judgment in favor of Bendinger Crockett on the legal malpractice claim, as well as in favor of the S & C Tech. defendants on the claims of fraud, breach of fiduciary duty, and unjust enrichment. We review a grant of summary judgment for correctness, viewing all inferences and disputed facts in the light most favorable to the nonmoving party.[1] Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[2]

## ANALYSIS

¶ 13 We will begin by addressing the burdens of each party on summary judgment. Then, we will review Borghetti's malpractice claim against Bendinger Crockett. Finally, we will discuss his claims of fraud, breach of fiduciary duty, and unjust enrichment against S & C Tech.

## I. BORGHETTI HAD THE BURDEN OF RAISING A GENUINE ISSUE OF MATERIAL FACT SUFFICIENT TO AVOID SUMMARY JUDGMENT

¶ 14 In this case, the defendants, who moved for summary judgment, had the initial burden of demonstrating that there was no issue of material fact and that they were

---

1. *Blue Cross & Blue Shield v. State,* 779 P.2d 634, 636 (Utah 1989).

2. Utah R. Civ. P. 56(c).

entitled to judgment as a matter of law.[3] But " 'once the moving party challenges an element of the nonmoving party's case on the basis that no genuine issue of material fact exists, the burden then shifts to the nonmoving party to present evidence that is sufficient to establish a genuine issue of material fact.' " [4] In this case, the defendants presented expert testimony that Borghetti's shares had no value, and that Borghetti, therefore, suffered no damages. The burden then shifted to Borghetti to present evidence raising a genuine issue of material fact as to the value of his shares.

## II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT IN FAVOR OF BENDINGER CROCKETT BECAUSE BORGHETTI SUFFERED NO DAMAGES AS A RESULT OF FAILING TO INSTITUTE AN APPRAISAL ACTION WITHIN THE 120–DAY FILING DEADLINE

¶ 15 Borghetti sued Bendinger Crockett for malpractice, alleging that he was injured by its failure to inform him of the 120–day filing deadline for an appraisal action under Delaware Code title 8 section 262. In view of the fact that the preferred shareholders were entitled to the $80.8 million liquidation preference that was triggered by the merger, Borghetti did not raise a genuine issue of material fact as to whether he suffered damages by not initiating an appraisal action, and he could not avoid summary judgment on his legal malpractice claim.

### A. To Avoid Summary Judgment on His Malpractice Claim, Borghetti Was Required to Raise a Genuine Issue of Material Fact as to Whether He Would Have Been Awarded Damages in an Appraisal Action

■ ¶ 16 The lack of damages or absence of direct causation of damages by the

alleged malpractice is fatal to any legal malpractice claim.[5] Plaintiffs suing for malpractice must show that there was a causal connection between the breach of duty and the resulting injury.[6] They must first prove the "case within the case." [7] The "case within the case" in this instance is the underlying appraisal action. After Bendinger Crockett submitted evidence showing that Borghetti suffered no damages as a result of failing to file an appraisal action, the burden shifted to Borghetti to show that he was damaged by Bendinger Crockett's failure to inform him of the 120–day deadline to commence an appraisal action. Therefore, to avoid summary judgment on his legal malpractice claim, Borghetti was required to show that he could have prevailed and collected damages in an appraisal action.

### B. In an Appraisal Action, the Court Assumes the Validity of the Merger

■ ¶ 17 By statute, shareholders in Delaware corporations are entitled to a judicial determination or appraisal of the fair value of their shares in the event of a merger.[8] In Cede & Co. v. Technicolor, the Supreme Court of Delaware defined an appraisal action as "a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." [9] The statute provides that "the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation" and the court

---

3. *Orvis v. Johnson*, 2008 UT 2, ¶ 10, 177 P.3d 600.

4. *Eagar v. Burrows*, 2008 UT 42, ¶ 15, 191 P.3d 9 (quoting *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 31, 54 P.3d 1054).

5. *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 44, 70 P.3d 17.

6. *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996).

7. *See id.* at 439–40.

8. Del.Code Ann. tit. 8, § 262(a) (2007).

9. 542 A.2d 1182, 1186 (Del.1988) (citations omitted), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del.2005).

shall consider "all relevant factors." [10] The court values the corporation "as an entity, not merely as a collection of assets, or by the sum of the market price of each share of its stock. Moreover, the corporation must be viewed as an on-going enterprise, occupying a particular market position in the light of future prospects." [11] Although an appraisal action challenges the adequacy of the price paid for the plaintiff's shares, it does not challenge the validity of the merger transaction itself, and rescission is not an available remedy. The only remedy available is an award for damages for the difference between the court-determined fair value and the price that was actually paid for the plaintiff's shares.[12] The court derives the fair value of the plaintiff's shares by assessing the value of the entire company and then dividing that value by the plaintiff's proportionate share.[13] Therefore, the court in an appraisal action *assumes the validity of the merger* and focuses exclusively on the fair value of the shareholder's shares.[14]

*C. Borghetti Has Not Raised a Genuine Issue of Material Fact as to Damages Because He Has Not Submitted Any Evidence That Campus Pipeline Was Worth More Than the Preferred Shareholders' Liquidation Preference*

¶ 18 In this case, the liquidation preference entitled the preferred shareholders of Campus Pipeline to receive the first $80.8 million in the event of a merger. Holders of Campus Pipeline common shares were not entitled to participate in the proceeds from a merger unless the sale price paid for Campus Pipeline exceeded the liquidation preference. Therefore, to raise an issue of material fact as to the fair value of his shares in the merger, Borghetti was required to offer some evidence that Campus Pipeline was worth more than $80.8 million. Numerous experts, including Borghetti's own expert, provided valuations as to the fair price of Campus Pipeline. Thomas Wiesel, an appraiser hired by Campus Pipeline to give fairness opinions related to the merger, testi-

fied that the value of Campus Pipeline was as much as $58.9 million. Bendinger Crockett's appraisal expert put the fair value of Campus Pipeline at $35 million, while the appraiser for S & C Tech. testified that the value was just over $36 million. Even Borghetti's expert, Avner Kalay, assessed the value of Campus Pipeline to be between $63.6 million and $72.9 million—still well below the $80.8 million liquidation preference. Because Borghetti offered no evidence to show that the value of Campus Pipeline was greater than the $80.8 million liquidation preference, he failed to raise a genuine issue of material fact as to whether he should have received consideration for his shares in a merger.

¶ 19 Although Borghetti submitted the Kalay affidavit, asserting that the value of his shares was between $4.2 and $6.7 million, this value is not purported to represent the fair price of his shares *in the merger*, which is assumed to be valid in a Delaware appraisal action. The merger eliminated any opportunity for eventual value in the common shares in an appraisal action. Because an appraisal action assumes the validity of the merger and the proceeds from any merger must satisfy the liquidation preference first, Borghetti cannot rely on any valuation of his shares that does not take into account the liquidation preference. Kalay's maximum value for Campus Pipeline of $72.9 million is wholly incompatible with any value for his shares in this context. While Kalay's estimate of the shares' value may represent the value of the shares in a different context— that is, if Campus Pipeline had not merged— it does not raise an issue of material fact as to the fair value that Borghetti should have received in the merger. The fair value for Borghetti's shares in the merger was clearly zero, and, therefore, he would not have been entitled to damages in an appraisal action. Because he suffered no damages as a result of failing to pursue an appraisal action, he cannot succeed in his malpractice claim, and the district court appropriately granted summary judgment in favor of Bendinger Crockett.

10. Del.Code Ann. tit. 8, § 262(h).

11. *In re Shell Oil Co.*, 607 A.2d 1213, 1218 (Del.1992) (citations and internal quotation marks omitted).

12. Del.Code Ann. tit. 8, § 262(i).

13. *See id.* tit. 8, § 262.

14. *Id.*

¶ 20 As an alternative ground on which to affirm summary judgment, Bendinger Crockett also argued that Borghetti never retained its services, and therefore, Bendinger Crockett owed no duty to inform Borghetti of the 120–day filing deadline. Because we determine that Borghetti failed to raise a genuine issue of material fact as to his damages resulting from malpractice, it is unnecessary to reach this alternative ground. The district court correctly granted summary judgment in favor of Bendinger Crockett on the malpractice claim, and we affirm.

### III. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON BORGHETTI'S CLAIMS AGAINST S & C TECH.

¶ 21 Having determined that Borghetti failed to raise a genuine issue of material fact as to damages sufficient to avoid summary judgment in the appraisal action underlying his malpractice claim, we now discuss the difference between the damages in an appraisal action and those associated with claims of fraud, breach of fiduciary duty, and unjust enrichment. We will then determine whether Borghetti raised a genuine issue of material fact sufficient to avoid summary judgment as to damages on these latter claims against S & C Tech.

*A. Because Borghetti's Claims of Fraud, Breach of Fiduciary Duty, and Unjust Enrichment Challenge the Validity of the Merger, Damages for These Claims May Include Rescissory Damages, Which in This Case Are the Value of His Shares Had CPI Not Merged*

¶ 22 Unlike an appraisal action, which assumes the validity of the merger,

claims for fraud, breach of fiduciary duty, and unjust enrichment challenge the validity of the merger itself.[15] As the Delaware Supreme Court in *Cede & Co. v. Technicolor* noted, "a statutory appraisal proceeding under section 262 and a rescissory suit for fraud, misrepresentation, self-dealing and other actionable wrongs violative of 'entire fairness' to minority shareholders serve different purposes and are designed to provide different, and not interchangeable, remedies."[16] In contrast to an appraisal action, which limits plaintiffs to recovering the fair value of their shares in the context of a merger that is assumed to be valid, plaintiffs asserting claims for fraud, breach of fiduciary duty, or unjust enrichment can seek rescission.[17]

¶ 23 Rescission is a restitutionary remedy designed, to the extent possible, to restore the parties to the position they occupied before the fraud or transaction.[18] While rescission is an equitable remedy, it is not always possible to restore the parties to the position they occupied before the transaction occurred. In this case, Borghetti is not asking that the merger, which occurred more than six years ago, be undone, but for rescissory damages.

¶ 24 We have characterized rescissory damages as "the value of the property . . . taken as of the time when it was transferred, or conveyed to the defendant."[19] And in the context of a claim for fraudulent inducement to buy securities, the Eighth Circuit has held that "[r]escissory damages 'contemplate a return of the injured party to the position he occupied before he was induced by wrongful

**15.** *See Cede & Co. v. Technicolor,* 542 A.2d 1182, 1187 (Del.1988), *aff'd in part, rev'd in part,* 884 A.2d 26 (Del.2005).

**16.** *Id.* at 1186.

**17.** *Id.* at 1187–88 ("'[A]n appraisal action may not provide a complete remedy for unfair dealing or fraud because a damage award in a fraud action may include 'rescissory damages if the [trier of fact] considers them susceptible of proof and a remedy appropriate to all issues of fairness before him.'" (quoting *Weinberger v. UOP, Inc.,* 457 A.2d 701, 714 (Del.1983)(alterations in original))).

**18.** *Breuer–Harrison, Inc. v. Combe,* 799 P.2d 716, 731 (Utah Ct.App.1990).

**19.** *Gillespie v. Blood,* 81 Utah 306, 17 P.2d 822, 825 (1932); *see also Lynch v. Vickers Energy Corp.,* 429 A.2d 497, 501 (Del.1981) (stating that "rescission would restore the parties to the *status quo* before sales of the shares were made") (emphasis in original), *overruled on other grounds by Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983).

conduct to enter into the transaction' and are the monetary equivalent of the property at issue." [20]   In this context, the measure of damages is the value of Borghetti's common shares in Campus Pipeline had the merger not taken place.

### B.  Had the Merger Never Occurred, the Preferred Shareholders' Liquidation Preference Would Not Necessarily Have Rendered Borghetti's Shares Valueless

¶ 25 Based on its ruling that Borghetti's own expert, Avner Kalay, had assigned a value to Campus Pipeline that was less than the $80.8 million liquidation preference, the district court concluded that Borghetti had failed to come forward with evidence creating a genuine issue of material fact on the question of whether he suffered damages.  Accordingly, the court granted summary judgment against Borghetti on all his claims.  While Borghetti is precluded from establishing damages with respect to his appraisal action because the value of Campus Pipeline as a whole was less than the liquidation preference, Borghetti is not precluded from establishing rescissory damages with respect to his fraud, breach of fiduciary duty, and unjust enrichment claims.  Had the merger never occurred, the preferred shareholders' liquidation preference would not necessarily have rendered Borghetti's shares valueless.

¶ 26 A preferred shareholders' liquidation preference may reduce the value of common shares in roughly the same way that a debt load will reduce the value of shares in a leveraged company.  In either case, the preference or debt may require satisfaction before the common shareholders receive any value.  But, where it is possible for a company to continue without liquidating, a liquidation preference does not necessarily render the common shares valueless simply because at a specific moment in time the value of the company as a whole falls below that preference.  If such a company continues for some period of time without liquidating and becomes worth more than the liquidation preference, the common shares may develop value.

¶ 27 Obviously, the ability of the company to continue operations without liquidating is important to the determination of the common shares' value.  If the company is in severe financial distress and cannot continue, those circumstances reduce the possibility that the company may continue operations long enough to turn its fortunes around.  But in order for the common shares to have some value, the company need only have the *potential* to someday be worth more than the liquidation preference.  Generally, unless the company is in severe financial distress, there is some possibility that the company will rebound and value will accrue to the common shares.  Therefore, as long as there was a potential that Campus Pipeline could someday be worth more than the liquidation preference, Borghetti's shares had some value.

¶ 28 In this case, there is evidence indicating that Campus Pipeline could have continued without merging and that eventually the common shares could have developed value.  At the time of the merger, Campus Pipeline had approximately $15 million in cash and cash equivalents, and the company was not compelled to merge to continue doing business or to complete its business model.  Using this capital, the company could have continued for some time even if it had continued to lose money.  If Campus Pipeline survived the economic downturn and became profitable, it had the potential to be worth more than the liquidation preference.

¶ 29 Because there is some potential that Campus Pipeline, if it had continued without merging, could have become worth more than the liquidation preference, the common shares had some value.  Simply put, the only way for the common shares to have a value of zero is if there were no potential that Campus Pipeline would ever become more valuable than the $80.8 million liquidation preference.  In light of the fact that Campus Pipeline was not bankrupt and did have the means to continue as an independent entity for some period of time, the possibility of

---

**20.** *Arthur Young Co. v. Reves,* 937 F.2d 1310, 1335 n. 34 (8th Cir.1991) (quoting Black's Law Dictionary 354 (5th ed. 1979)).

eventual success, while perhaps slim, was almost certainly not zero. The value of Borghetti's shares, therefore, also was not zero. Accordingly, the fact that the value of Campus Pipeline as a whole was less than the liquidation preference does not necessarily preclude Borghetti from establishing rescissory damages as to his fraud, breach of fiduciary duty, and unjust enrichment claims.

¶ 30 S & C Tech. argues that Borghetti's claim is, in essence, that a company's board of directors must refuse a merger unless the common shareholders receive value.[21] Were this the case, common shareholders would have a right to force a company to keep operating without merging until its value exceeds the liquidation preference or the company becomes bankrupt. We do not so hold. Specifically, we do not hold that a company may never merge or sell itself for less than a liquidation preference. Nor do we hold that such a company must continue as a separate entity for the purpose of waiting to see if its fortunes will turn around for the sole benefit of the common shareholders. And we do not hold that a merger for less than a preferred shareholders' liquidation preference is necessarily a breach of fiduciary duty to or fraud on the common shareholders. We merely hold that if a common shareholder in such a situation can prove that the merger was a result of fraud or breach of fiduciary duty, or resulted in unjust enrichment, the appropriate measure of damages is the value of the plaintiff's shares had the company not merged.

*C. The Kalay Affidavit, if Admissible, Raises a Genuine Issue of Material Fact as to the Issue of Borghetti's Damages on His Claims Against S & C Tech.*

■ ¶ 31 While Borghetti is not precluded from establishing damages as to his claims against S & C Tech. by the fact that the value of Campus Pipeline was less than the liquidation preference, in order to overcome summary judgment Borghetti must come forward with admissible "evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages."[22] Borghetti has sought to meet this obligation through the Kalay Affidavit. In this affidavit, Kalay testifies that Borghetti's shares had a fair value at the time of the merger between $4.2 million and $6.76 million. In arriving at these values, Kalay employs a method used to value options known as the Black–Scholes method. While this affidavit does not raise a genuine issue of material fact as to damages on Borghetti's Delaware appraisal action, where the validity of the merger is assumed, the affidavit may raise an issue of material fact as to damages in Borghetti's fraud, breach of fiduciary duty, and unjust enrichment claims, where the validity of the merger is challenged. Accordingly, the district court erred in concluding that because the value of Campus Pipeline was less than the liquidation preference, Borghetti could not show damages on his claims against S & C Tech.

¶ 32 Because the district court granted summary judgment based on the fact that Kalay had assessed the value of Campus Pipeline at less than the liquidation preference, the court deemed the affidavit moot and did not consider the merits of defendants' motions to strike the affidavit. We conclude that, if admissible, the Kalay affidavit is sufficient to create a genuine issue of material fact as to damages on Borghetti's claims against S & C Tech. Accordingly, the district court erred in ruling that the motions to strike the affidavit were moot. We reverse the district court's grant of summary

---

21. In support of its argument, S & C Tech. cites *Orban v. Field* in which Staples purchased Office Mart for less than Office Mart's preferred shareholders' liquidation preference, resulting in cancellation of Orban's common shares without compensation. No. 12820, 1997 WL 153831, at *7–8, 1997 Del. Ch. LEXIS 48, at *26 (Del. Ch. April, 1997). But the court in *Orban* did not hold that Orban did not suffer damages; it held that, as a matter of law, the Board of Directors did not breach its fiduciary duty. *Id.* 1997 WL

153831, at *9–10, 1997 Del. Ch. LEXIS at *32–33. And, unlike Borghetti, who challenges the validity of the merger itself, Orban made "no claim that the Board engaged in fraud or that the merger itself was not in the best interests of the corporation." *Id.* 1997 WL 153831 at *8, 1997 Del. Ch. LEXIS at *26 n. 23.

22. *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.,* 709 P.2d 330, 336 (Utah 1985).

judgment on Borghetti's claims against S & C Tech. and remand so that the district court may, in the first instance, assess the admissibility of the Kalay affidavit.

## CONCLUSION

¶ 33 We conclude that the district court was correct in granting summary judgment in favor of Bendinger Crockett on the legal malpractice claim because Borghetti failed to show that he was damaged by the firm's failure to inform him of the 120–day deadline to commence an appraisal action. In an appraisal action, damages are the fair value of the plaintiff's shares in a merger, and Borghetti's shares had no value in the merger at issue here because of the liquidation preference. But we reverse the district court's grant of summary judgment in favor of S & C Tech. Rescissory damages associated with the claims against S & C Tech. are the value of Borghetti's common shares if the merger had not taken place. The Kalay affidavit, if admissible, raises a genuine issue of material fact sufficient to avoid summary judgment as to those claims because Borghetti's shares may have had value if the merger had not taken place. Lastly, we decline to rule on the admissibility of the Kalay affidavit because the district court should rule on the admissibility of the affidavit in the first instance.

¶ 34 We affirm with regard to the malpractice claim against Bendinger Crockett. But we reverse and remand for proceedings consistent with this opinion on the claims against S & C Tech.

¶ 35 Justice WILKINS, Justice PARRISH, Judge DAVIS, and Judge BACKLUND concur in Associate Chief Justice DURRANT'S opinion.

¶ 36 Having disqualified herself, Chief Justice DURHAM does not participate herein; District Judge JOHN C. BACKLUND sat.

¶ 37 Justice NEHRING does not participate herein; Court of Appeals Judge JAMES Z. DAVIS sat.