CEDE & CO. and Cinerama,
Inc., Petitioners Below,
Appellants,

v.

TECHNICOLOR, INC., Respondent
Below, Appellee.

No. 477, 1995.

Supreme Court of Delaware.

Submitted: June 4, 1996.
Decided: Oct. 21, 1996.

Robert K. Payson and Arthur L. Dent of Potter, Anderson & Corroon, Wilmington, and Gary J. Greenberg (argued), New York City, for appellants.

Rodman Ward, Jr., Thomas J. Allingham, II (argued), and R. Michael Lindsey of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for appellee.

Before WALSH and HOLLAND, JJ., and HORSEY, Justice, Retired.[1]

HOLLAND, Justice:

This appeal is from a final judgment of the Court of Chancery in an appraisal action. The proceeding arises from a cash-out merger of the minority shareholders of Technicolor Incorporated ("Technicolor"), a Delaware corporation. With the approval from a majority of Technicolor's shareholders, MacAndrews & Forbes Group Incorporated ("MAF") merged its wholly-owned subsidiary, Macanfor Corporation ("Macanfor"), into Technicolor. The only defendant-appellee in this appraisal action is Technicolor, the

surviving corporation of the merger. The plaintiffs-appellants are Cinerama, Incorporated, the beneficial owner of 201,200 shares of Technicolor common stock, and Cede & Company, the record owner of those shares (collectively "Cinerama.")

Cinerama contends, *inter alia,* that the Court of Chancery erred, as a matter of law, in appraising the fair value of its Technicolor shares. According to Cinerama, that legal error was a refusal to include in the valuation calculus "MAF's new business plans and strategies for Technicolor, which the [C]ourt [of Chancery] *found* were not speculative but had been developed, adopted and implemented" between the date of the merger agreement and the date of the merger. That contention is correct and dispositive of this appeal. *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983). Accordingly, the appraisal action will be remanded for further proceedings in accordance with this opinion. Cinerama's other contentions are addressed only to the extent they are relevant to the remand.

**Procedural History**

This is the fourth appeal by Cinerama relating to the same companion litigation: a first-filed Delaware statutory appraisal proceeding (the "appraisal action"), and a later-filed shareholder rescissory damages lawsuit for "fraud" and unfair dealing (the "personal liability action"). Cinerama's first appeal was taken from an interlocutory judgment. In that appeal, this Court concluded the Court of Chancery had erred, as a matter of law, in requiring Cinerama to make an election of remedies before trial. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182 (1988) (*"Technicolor I "*). This Court held that Cinerama was entitled to pursue its appraisal action and its personal liability action concurrently, through trial. *Id.* at 1192. Both proceedings were remanded to the Court of Chancery. *Id.*

The consolidated trial of the personal liability and appraisal actions lasted forty-seven days. The Court of Chancery announced its decision in the appraisal action on October

1. Sitting by designation pursuant to Del. Const. art. IV, §§ 12, 38.

19, 1990. In its "appraisal opinion," the Court of Chancery found the fair value of Cinerama's Technicolor stock to be $21.60 per share as of the date of the merger, January 24, 1983. *Cede & Co. v. Technicolor, Inc.*, Del.Ch., C.A. No. 7129, 1990 WL 161084 (Oct. 19, 1990).

The Court of Chancery issued its "personal liability opinion" in June 1991. *Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., C.A. No. 8358, 1991 WL 111134 (June 24, 1991), *reprinted in* 17 DEL.J.CORP.L. 551 (1992). The Court of Chancery held that, even if the defendant-directors had not exercised due care in approving the merger, Cinerama had not been damaged. It reached that conclusion on the basis that the $21.60 per share valuation, in its appraisal opinion was less than the merger agreement price of $23 per share. The Court of Chancery entered judgment for the defendants in the personal liability action.

Cinerama's second appeal to this Court was from the final judgments entered in both the appraisal action and the personal liability action. *Cede & Co. v. Technicolor, Inc.*, Del. Supr., 634 A.2d 345 (1993) ("*Technicolor II*"), *modified on reargument*, 636 A.2d 956 (1994). Technicolor cross-appealed from the judgment in the appraisal action. *Id.* This Court affirmed in part, reversed in part, and remanded the personal liability action to the Court of Chancery for an application of the entire fairness standard to the challenged transaction and to resolve certain additional issues relating to the duty of loyalty. *Technicolor II*, 634 A.2d at 373. This Court also concluded that the issues raised by the appeal and cross-appeal in the appraisal action were "moot" as a result of our decision in the liability action. *Id.* at 351.

Following this Court's decision in *Technicolor II,* the parties agreed to submit the remanded issues in the personal liability action to the Court of Chancery for a decision without presenting any additional evidence. After reconsideration, the Court of Chancery issued an opinion which initially resolved the loyalty issues identified by this Court in *Technicolor II* and then concluded that the defendants had met their burden of showing entire fairness. *Cinerama, Inc. v. Technicol-*

*or, Inc.*, Del.Ch., 663 A.2d 1134, 1144 (1994). The Court of Chancery entered another judgment for the defendants in the personal liability action.

Cinerama filed its third appeal. This Court affirmed the Court of Chancery's final judgment in the personal liability action. *Cinerama, Inc. v. Technicolor, Inc.*, Del. Supr., 663 A.2d 1156, 1180 (1995) ("*Technicolor III* "). Although the liability action had been concluded in favor of the defendants, Cinerama was still entitled to receive the fair value of its Technicolor shares. *Technicolor I*, 542 A.2d at 1191. Consequently, the appraisal action, which had remained in abeyance following this Court's remand in *Technicolor II,* was no longer moot.

The Court of Chancery entered a Restated Modified Order and Final Judgment in the appraisal action on October 27, 1995. That judgment set the fair value of a share of Technicolor stock at $21.60. The judgment awarded Cinerama: the principal amount of $4,345,920; pre-judgment interest on that amount at the rate of 10.32%, compounded annually from January 24, 1983 (the date of the merger) to August 2, 1991 (the date of the original appraisal action judgment); and post-judgment interest thereafter, at the rate of 10.5% simple interest, accruing only on the principal award of $4,345,920.

Cinerama filed a timely appeal with this Court. Technicolor did not cross-appeal. Cinerama's fourth appeal is the subject matter of this opinion.

### Facts

The history of this litigation has been recounted at length. *Technicolor II,* 634 A.2d at 351–58; *Technicolor I,* 542 A.2d at 1185–86; *Cinerama, Inc. v. Technicolor, Inc.*, Del. Ch., 663 A.2d 1134, 1135–37 (1994). We will rely upon those comprehensive recitations of the entire facts. Only the operative facts that are relevant to this appeal in the appraisal action will be recounted. Technicolor was a corporation with a long and prominent history in the film/audio-visual industries. By the early eighties, Technicolor's increase in market share had leveled off. The company's core business earnings had stagnated.

Technicolor engaged in a number of distinct businesses through separate operating units. Technicolor's Professional Services Group was its main source of revenue and profit. The Videocassette Duplicating Division operated one of the largest duplicating facilities in the world. The Consumer Services Group operated film processing laboratories ("Consumer Photo Processing Division" or "CPPD"), which provided film processing services to other photofinishers. CPPD also operated the Standard Manufacturing Company ("Standard"), which manufactured film splicers and associated equipment. The Government Services Group ("Government Services") provided photographic and non-photographic support and management services under contract to governmental agencies. Technicolor's Gold Key Entertainment Division ("Gold Key"), licensed motion pictures and other programs for television exhibition. The Audio Visual Division ("Audio Visual") distributed film and video equipment.

Morton Kamerman ("Kamerman"), Technicolor's Chief Executive Officer and Board Chairman, concluded that Technicolor's principal business, theatrical film processing, did not offer sufficient long-term growth for Technicolor. Kamerman proposed that Technicolor enter the field of rapid processing of consumer film by establishing a network of stores across the country offering one-hour development of film. The business, named One Hour Photo ("OHP"), would require Technicolor to open approximately 1,000 stores over five years and to invest about $150 million.

In May 1981, Technicolor's Board of Directors approved Kamerman's plan. The following month, Technicolor announced its ambitious venture with considerable fanfare. On the date of its OHP announcement, Technicolor's stock had risen to a high of $22.13.

In the months that followed, Technicolor fell behind on its schedule for OHP store openings. The few stores that did open reported operating losses. At the same time, Technicolor's other major divisions were experiencing mixed, if not disappointing, results.

As of August 1982, Technicolor had opened only twenty-one of a planned fifty OHP retail stores. Its Board was anticipating a $5.2 million operating loss for OHP in fiscal 1983. On August 25, 1982, the Technicolor Board "authorized the company's officers to seek a buyer for Gold Key." During 1982, Technicolor also decided to terminate the Audio Visual Division. Nevertheless, Kamerman remained committed to OHP. In Technicolor's Annual Report, issued September 7, 1982, Kamerman stated, "We remain optimistic that the One Hour Photo business represents a significant growth opportunity for the Company."

Technicolor's September 1982 financial statements, for the fiscal year ending June 1982, reported an eighty percent decline of consolidated net income—from $17.073 million in fiscal 1981 to $3.445 million in 1982. Profits had declined in Technicolor's core business, film processing. Technicolor's management also attributed the decline in profits to write-offs for losses in its Gold Key and Audio Visual divisions, which had already been targeted for sale. By September 1982, Technicolor's stock had reached a new low of $8.37 after falling by the end of June to $10.37 a share.

In the late summer of 1982, Ronald O. Perelman ("Perelman"), MAF's controlling stockholder, concluded that Technicolor would be an attractive candidate for a takeover or acquisition by MAF. Kamerman and Perelman met for the first time on October 4, 1982 at Technicolor's offices in Los Angeles. Perelman informed Kamerman that MAF would be willing to pay $20 per share to acquire Technicolor. Kamerman replied that he would not consider submitting the matter to Technicolor's Board at a price below $25 a share.

Perelman met with Kamerman in Los Angeles for a second time on October 12, 1982. MAF's Chief Financial Officer also attended the meeting. The meeting's principal purposes were: (1) to allow MAF's Chief Financial Officer to review Technicolor financial data; and (2) to give Perelman a tour of Technicolor's Los Angeles facilities.

On October 27, Kamerman and Perelman reached an agreement by telephone. Perel-

man initially offered $22.50 per share for Technicolor's stock. Kamerman countered with a figure of $23 per share. He also stated that he would recommend its acceptance to the Technicolor Board. Perelman agreed to the $23 per share price.

The Technicolor Board convened on October 29, 1982 to consider MAF's proposal. All nine directors of Technicolor attended the meeting. Kamerman outlined the history of his negotiations with Perelman. Kamerman explained the basic structure of the transaction: a tender offer by MAF at $23 per share for all the outstanding shares of common stock of Technicolor; and a second-step merger with the remaining outstanding shares converted into $23 per share, with Technicolor becoming a wholly owned subsidiary of MAF. Kamerman recommended that MAF's $23 per share offer be accepted in view of the present market value of Technicolor's shares. Kamerman stated that accepting $23 a share was "advisable rather than shooting dice" on the prospects of Technicolor's OHP venture.

On October 29, 1982, the Technicolor Board agreed to the acquisition proposal by MAF. The Technicolor Board: approved the Agreement and Plan of Merger with MAF; recommended to the stockholders of Technicolor the acceptance of the offer of $23 per share; and recommended the repeal of the supermajority provision in Technicolor's Certificate of Incorporation. Technicolor filed forms 14D–9 and 13D with the Securities and Exchange Commission which reflected those Board actions and recommendations.

In November 1982, MAF commenced an all-cash tender offer of $23 per share to the shareholders of Technicolor. When the tender offer closed on November 30, 1982, MAF had gained control of Technicolor.[2] By December 3, 1982, MAF had acquired 3,754,181 shares, or 82.19%, of Technicolor's shares. Thereafter, MAF and Technicolor were consolidated for tax and financial reporting purposes.

The Court of Chancery made a factual finding that, "upon acquiring control" of

Technicolor, Perelman and his associates "began to dismember what they saw as a badly conceived melange of businesses." Perelman testified: "Presumably we made the evaluation of the business of Technicolor before we made the purchase, not after." That evaluation assumed the retention of the Professional and Government Services Groups and the disposition of OHP, CPPD, Gold Key and Audio Visual.

Consequently, immediately after becoming Technicolor's controlling shareholder, MAF "started looking for buyers for several of the [Technicolor] divisions." Bear Stearns & Co. was also retained by MAF in December 1982 to assist it in disposing of Technicolor assets. A target date of June 30, 1983 was set for liquidating all of Technicolor's excess assets. As of December 31, 1982, MAF was projecting that $54 million would be realized from asset sales.

In December 1982, the Board of Technicolor notified its stockholders of a special shareholders meeting on January 24, 1983. At the meeting, the Technicolor shareholders voted to repeal the supermajority amendment and in favor of the proposed merger. MAF and Technicolor completed the merger.

### Valuation of Technicolor
### Perelman Plan or Kamerman Plan

The merger was accomplished on January 24, 1983. The parties agree that the appraised value of Technicolor must be fixed as of that date. *See Alabama By–Products Corp. v. Neal*, Del.Supr., 588 A.2d 255, 256–57 (1991). There is a fundamental disagreement between the litigants, however, concerning the nature of the enterprise to be appraised.

Cinerama argues that the Court of Chancery should have valued Technicolor as it existed on the date of the merger and, in particular, with due regard for the strategies that had been conceived and implemented following the merger agreement by MAF's controlling shareholder, Ronald O. Perelman ("Perelman Plan"). Technicolor argues that

---

**2.** As stipulated by the parties, the Court of Chancery's opinion is mistaken when it states that MAF gained control "by December 31, 1982."

the Court of Chancery properly considered Technicolor without regard to the Perelman Plan and only as it existed on or before October 29, 1982, with the then extant strategies that had been conceived and implemented by Technicolor's Chairman, Morton Kamerman ("Kamerman Plan"). According to Cinerama:

> Reduced to its simplest form, the dispute was whether the trial court should value Perelman's Technicolor—a company whose business plans and strategies focused on the processing and duplication of film and videotape and the provision of services to the United States Government and which planned and expected to generate $50 million in cash during 1983 from the sale of unwanted and/or unsuccessful businesses, namely, OHP, CPPD, Gold Key and Audio Visual; or Kamerman's Technicolor—a company whose business plans and strategies assumed diversification away from a concentration on film processing and videotape duplication for the professional market toward consumer oriented businesses, especially OHP.

The economic experts for both parties used a form of discounted cash flow methodology to value Technicolor. Cinerama's expert was John Torkelsen ("Torkelsen"), a financial analyst with Princeton Venture Research, Inc. Technicolor's primary expert witness was Alfred Rappaport ("Rappaport"), a professor at Northwestern University Graduate Business School and a consultant with The Alcar Group ("Alcar"). The fundamental nature of the disagreement between the parties about the Perelman Plan and the Kamerman Plan, however, resulted in different factual assumptions by their respective experts.

## Question of Law
### Perelman Plan or Kamerman Plan

The Court of Chancery recognized that the parties' disagreement about valuing Technicolor based upon either the Perelman Plan or the Kamerman Plan presented a question of law with regard to the proper interpretation of the appraisal statute. *See* 8 *Del.C.*

§ 262(h). According to the Court of Chancery, that legal

> issue is whether in valuing Technicolor as of January 24, 1983, the court should assume the business plan for Technicolor that MAF is said by [Cinerama] to have had in place at that time [Perelman Plan], or whether a proper valuation is premised upon ignoring such changes as Mr. Perelman had in mind because to the extent they create value they are "elements of value arising from the accomplishment or expectation of the merger." 8 *Del.C.* § 262(h).

The Court of Chancery also recognized that legal issue was "particularly pertinent when considering One Hour Photo, Standard Manufacturing and [the Consumer Photo Processing Division]." Torkelsen's valuation assumed each of those businesses would be sold by MAF. Rappaport assumed that, but for the MAF acquisition, those businesses would have continued operating. Therefore, the Rappaport valuations included those businesses as going concerns. Predictably, the different assumptions factored into each expert's discounted cash flow model yielded disparate valuation results.[3]

## The Parties' Contentions
### Perelman Plan or Kamerman Plan

In the Court of Chancery, Cinerama argued that the Perelman Plan—which contemplated the sale of several businesses, focusing the company on film processing, and the new videocassette duplication business—was governing the operation of Technicolor on January 24, 1983. Consequently, Cinerama argued Perelman's Plan had to govern any expert's projection of net cash flow. For example, according to Cinerama, Technicolor's previous projections of negative cash flow from OHP's operation would be irrelevant in the appraisal valuation. In support of its position, Cinerama presented evidence that, prior to the merger date, Perelman had not only formulated, but had also implemented, a plan for how OHP and certain other Technicolor assets would be sold.

---

**3.** Cinerama's expert opined that the statutory appraisal fair value of Technicolor on a per share basis as of January 24, 1983 was $62.75. Technicolor's expert opined that the statutory appraisal fair value of Technicolor at the time of the merger was $13.14 per share.

Technicolor argued to the Court of Chancery that the Perelman Plan, which it admitted called for the liquidation of OHP and a number of its other businesses, was not sufficiently defined on the date of the merger to form the factual premise for the Cinerama expert's cash flow projections from asset sales. The Court of Chancery unequivocally rejected that assertion by Technicolor. The Court of Chancery made a specific factual finding that "the record supports the conclusion that MAF intended from the outset to realize by one technique or another the capital value of One Hour Photo and to terminate that division's drain on the company's cash flow. Insofar as sale of that enterprise is involved, the 'Perelman Plan' was fixed by the merger date."[4]

In view of that adverse factual determination, Technicolor's alternative contention was a legal argument. According to Technicolor, any value attributable to the Perelman Plan as of the merger date had to be excluded as arising from the expectation of the merger. *See* 8 *Del.C.* § 262(h). Thus, Technicolor argued that the net cash flows which followed from the Perelman Plan should be excluded from the statutory appraisal valuation, as a matter of law.

In response, Cinerama argued to the Court of Chancery that this Court had construed the statutory phrase "exclusive of any element of value arising from the accomplishment or expectation of the merger" to exclude "[o]nly the speculative elements of value that may arise from the 'accomplishment or expectation' of the merger.... But elements of future value ... which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered." *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 713 (1983). Thus, Cinerama argued any nonspeculative element of future value that could be proven may be considered in a statutory appraisal proceeding, even if it is an "element of value arising from the accomplishment or expectation of the merger." *See* 8 *Del.C.* § 262(h).

### Court of Chancery's Holding
### Majority Acquiror Principle
### Proximate Cause Exception

The Court of Chancery acknowledged that, based upon the quoted language from *Weinberger,* Cinerama's legal argument appeared to be persuasive. The Court of Chancery concluded, however, "that reading [of *Weinberger*] is too difficult to square with the plain words of the statute to permit the conclusion that that is what was intended." The Court of Chancery then stated "in order to understand the quoted passage [from *Weinberger*] when read together with the statutory language, I assume an unexpressed phrase to the effect 'unless, but for the merger, such elements of future value would not exist.'" According to the Court of Chancery, the language in *Weinberger* would read: "But elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered [unless, but for the merger, such elements of future value would not exist]." *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 713 (1983).

In explaining the "but for" caveat that it had superimposed upon this Court's holding in *Weinberger,* the Court of Chancery reasoned that, as a matter of policy, the valuation process in a statutory appraisal proceeding should be the same irrespective of whether a merger is accomplished in one or two steps:

Delaware law traditionally and today accords to a dissenting shareholder "his proportionate interest in a going concern" and that going concern is the corporation in question, with its asset deployment, business plan and management unaffected by the plans or strategies of the acquiror. When value is created by substituting new management or by redeploying assets "in connection with the accomplishment or expectation" of a merger, that value is not, in my opinion, a part of the "going concern" in which a dissenting shareholder has a legal (or equitable) right to participate.

---

4. In *Technicolor II,* Technicolor filed a cross-appeal which contended that the Court of Chancery erred in "finding that MAF's strategic plan was sufficiently definite as of the Merger" to be valued. Technicolor *did not file a cross-appeal* on any issue in this appeal.

If one accepts this principle, the question arises how is it to be applied in a two-step arms'-length acquisition transaction. In such a transaction there will be a period following close [to] the first-step tender offer in which the [majority] acquiror may, as a practical matter, be in a position to influence or change the nature of the corporate business, or to freeze controversial programs until they are reviewed following the second-step merger.

Accordingly, the Court of Chancery concluded that "[f]uture value that would not exist *but for* the merger ... even if it is capable of being proven on the date of the merger," is irrelevant in a Delaware statutory appraisal proceeding. (Emphasis added.) Consequently, the Court of Chancery held "that value added to [Technicolor] by the implementation or the expectation of the implementation of Mr. Perelman's new business plan for [Technicolor] is not value to which, in an appraisal action, [Cinerama] is entitled to a *pro rata* share, but is value that is excluded from consideration by the statutory exclusion for value arising from the merger or its expectation."

Legal scholars have written extensively with regard to the economic desirability of including or excluding certain valuation elements in an appraisal proceeding,[5] especially with regard to cash-out two-step mergers. *See, e.g.,* John C. Coffee, Jr., *Transfers of Control and the Quest for Efficiency: Can Delaware Law Encourage Efficient Transactions While Chilling Inefficient Ones?* 21 DEL.J.CORP.L. 359 (1996); Robert B. Thompson *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law,* 84 GEO.L.J. 1 (1995).[6] The Court of Chancery's construction of "fair value" followed logically from its

concept of what was economically desirable and efficient. However, the majority acquiror principle and correlative proximate cause exception for two-step mergers, upon which the Court of Chancery premised its holding, are inconsistent with this Court's interpretation of the appraisal statute in *Weinberger.*

### All Relevant Factors
### Only Speculation Excluded

■ An appraisal proceeding is a limited statutory remedy. *Technicolor I,* 542 A.2d at 1186. Its legislative purpose is to provide equitable relief for shareholders dissenting from a merger on grounds of inadequacy of the offering price. *Id.* The appraisal statute affords the dissenters the right to a judicial determination of the fair value of their shareholdings. *Id.* (citing *Weinberger v. UOP, Inc.* Del.Supr., 457 A.2d 701, 714 (1983)); *accord Cavalier Oil Corp. v. Harnett,* Del. Supr., 564 A.2d 1137, 1142 (1989). We summarized the nature of the proceeding in *Technicolor I,* as follows:

> in a section 262 appraisal action the only litigable issue is the determination of the value of the appraisal petitioners' shares on the date of the merger, the only party defendant is the surviving corporation and the only relief available is a judgment against the surviving corporation for the fair value of the dissenters' shares.

*Technicolor I,* 542 A.2d at 1187.

The seminal decision by this Court regarding an appraisal proceeding is *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983).[7] In *Weinberger,* this Court broadened the process for determining the "fair value" of the company's outstanding shares by including all generally accepted techniques of valuation used in the financial com-

---

5. *See, e.g.,* FRANK H. EASTERBROOK & DANIEL R. FISCHEL, THE ECONOMIC STRUCTURE OF CORPORATE LAW (Harvard Univ. Press 1991); Benjamin Hermalin & Alan Schwartz, *Buyouts in Large Companies,* 25 J.LEGAL STUD. 351 (1996); Lynn A. Stout, *Are Takeover Premiums Really Premiums? Market Price, Fair Value, and Corporate Law,* 99 YALE L.J. 1235 (1990); Angie Woo, Note, *Appraisal Rights in Mergers of Publicly-Held Delaware Corporations: Something Old, Something New, Something Borrowed, and Something B.L.U.E.,* 68 S. CAL.L.REV. 719 (1995).

6. *See also* Bate C. Toms, III, *Compensating Shareholders Frozen Out in Two–Step Mergers,* 78 COLUM.L.REV. 548 (1978).

7. Although *Weinberger* did not involve an appraisal action *per se,* this Court has recognized *Weinberger's* interpretation of the appraisal statute as definitive in subsequent appeals from appraisal proceedings. *See, e.g., Rapid–American v. Harris,* Del.Supr., 603 A.2d 796 (1992); *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137 (1989); *see also Technicolor I,* 542 A.2d at 1186–87.

munity. *Weinberger v. UOP, Inc.,* 457 A.2d at 712–13; *see Technicolor I,* 542 A.2d at 1186–87. The result of that expansion was the holding in *Weinberger* that "the standard 'Delaware block' or weighted average method of valuation, formerly employed in appraisal and other stock valuation cases, shall no longer exclusively control such proceedings." *Weinberger v. UOP, Inc.,* 457 A.2d at 712–13.

The Delaware appraisal statute provides that the Court of Chancery:

> shall appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.

8 *Del.C.* § 262(h). In *Weinberger,* this Court construed the appraisal statute. That construction required this Court to reconcile the dual mandates of Section 262(h) which direct the Court of Chancery to: determine "fair" value based upon "all relevant factors;" but, to exclude "any element of value arising from the accomplishment or expectation of the merger." In making that reconciliation, the *ratio decidendi* of this Court was, as follows:

> *Only the speculative elements of value that may arise from the "accomplishment or expectation" of the merger are excluded. We take this to be a very narrow exception to the appraisal process,* designed to eliminate use of *pro forma* data and projections of a speculative variety relating to the completion of a merger. But elements of future value, including the *nature of the enterprise,* which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered. When the trial court deems it appropriate, fair value also includes any damages, resulting from the taking, which the stockholders sustain as a class. If that was not the case, then the obligation to consider "all relevant factors" in the valuation process would be eroded. We are supported in this view not only by [*Tri–Continental Corp. v. Battye,* Del.Supr., 74

A.2d 71, 72 (1950) ], but also by the evolutionary amendments to section 262.

*Weinberger v. UOP, Inc.,* 457 A.2d at 713 (emphasis added).

After examining the evolution of the statutory text in Section 262(h), this Court concluded "there is a legislative intent to fully compensate shareholders for whatever their loss may be, *subject only to the narrow limitation that one can not take speculative effects of the merger into account." Id.* at 714 (emphasis added). Therefore, in *Weinberger,* this Court held that the more liberal methodology we had just authorized in appraisal and other stock valuation cases *"must* include proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court, *subject only to our [narrow] interpretation of [the exclusionary language in] 8 Del.C. § 262(h),"* i.e., requiring that only speculative elements of value, which may arise from the accomplishment or expectation of the merger, be disregarded. *Weinberger v. UOP, Inc.,* 457 A.2d at 713 (emphasis added); *see also Kahn v. Household Acquisition Corp.,* Del.Supr., 591 A.2d 166, 174 (1991); *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 940 (1985).

This Court's final holding in *Weinberger* was to overrule the trilogy of cases that had adopted the business purpose test for mergers. *Weinberger v. UOP, Inc.,* 457 A.2d at 715. We explained that the final holding followed logically from the entire fairness test, the expanded appraisal remedy being made available to dissenting shareholders, and the Court of Chancery's broad discretion to fashion equitable relief. *Id.* Consequently, we concluded that no "additional meaningful protection is afforded minority shareholders by the business purpose requirement." *Id.* Accordingly, the majority may now cashout the minority by a merger without a business purpose, but must pay the dissenters fair value for *"whatever* their loss may be, subject only to the narrow limitation that one can not take speculative effects of the merger into account." *Id.* at 714 (emphasis added).

## Perelman Plan
### Susceptible of Proof/Non–Speculative

■ The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred. *Cavalier Oil Corp. v. Harnett*, Del. Supr., 564 A.2d 1137, 1145 (1989). Accordingly, the Court of Chancery's task in an appraisal proceeding is to value what has been taken from the shareholder, *i.e.*, the proportionate interest in the going concern. *Id.* at 1144 (citing *Tri–Continental Corp. v. Battye*, Del.Supr., 74 A.2d 71, 72 (1950)). To that end, this Court has held that the corporation must be valued as an operating entity. *Id.* We conclude that the Court of Chancery did not adhere to this principle.

The Court of Chancery determined that Perelman "had a fixed view of how [Technicolor's] assets would be sold before the merger and had begun to implement it" prior to January 24, 1983. Consequently, the Court of Chancery found that the Perelman Plan for Technicolor was the operative reality on the date of the merger. Nevertheless, the Court of Chancery held that Cinerama was not entitled to an appraisal of Technicolor as it was actually functioning on the date of the merger pursuant to the Perelman Plan.

The Court of Chancery reached that holding by applying its majority acquiror principle and correlative proximate cause exception. The Court of Chancery excluded any value that was admittedly part of Technicolor as a going concern on the date of the merger, if that value was created by substituting new management or redeploying assets during the transient period between the first and second steps of this two-step merger, *i.e.*, Perelman's Plan. The Court of Chancery reasoned that valuing Technicolor as a going concern, under the Perelman Plan, on the date of the merger, would be tantamount to awarding Cinerama a proportionate share of a control premium, which the Court of Chancery deemed to be both economically undesirable and contrary to this Court's holding in *Bell v. Kirby Lumber Corp.*, Del.Supr., 413 A.2d 137, 140–42 (1980).[8] *See also Rapid–American Corp. v. Harris*, Del.Supr., 603 A.2d 796, 805–07 (1992). Thus, the Court of Chancery concluded "that value [added by a majority acquiror] is not ... a part of the 'going concern' in which a dissenting shareholder has a legal (or equitable) right to participate."

In *Kirby* and its progeny, including *Technicolor I*, this Court has explained that the dissenter in an appraisal action is entitled to receive a proportionate share of fair value in the *going concern* on the date of the merger, rather than value that is determined on a liquidated basis. *Bell v. Kirby Lumber Corp.*, 413 A.2d at 142; *see also In re Shell Oil Co.*, Del.Supr., 607 A.2d 1213, 1219 (1992); *Technicolor I*, 542 A.2d at 1186; *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 942 (1985); *Rothschild Int'l. Corp. v. Liggett Group Inc.*, Del.Supr., 474 A.2d 133, 137 (1984); *accord Rapid–American Corp. v. Harris*, 603 A.2d at 802–03.[9] Thus, the company must first be valued as an operating entity. *Cavalier Oil Corp. v. Harnett*, 564 A.2d at 1144. In that regard, one of the most important factors to consider is the "nature of the enterprise" that is the subject of the appraisal proceeding. *Rapid–American Corp. v. Harris*, 603 A.2d at 805; *see Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (1983).

■ In a two-step merger, to the extent that value has been added following a change in majority control before cash-out, it is still value attributable to the going concern, *i.e.*, the extant "nature of the enterprise," on the date of the merger. *See Rapid–American Corp. v. Harris*, 603 A.2d at 805. The dissenting shareholder's proportionate interest is determined only after the company has been valued as an operating entity on the date of the merger. *Cavalier Oil Corp. v. Harnett*, 564 A.2d at 1144; *cf. Walter W.B. v. Elizabeth P.B.*, Del.Supr., 462 A.2d 414, 415 (1983). Consequently, value added to the

---

**8.** Although the Court of Chancery's analysis preceded our decision explaining *Kirby* in *Rapid–American Corp.*, it is also inconsistent with our explanation of the concept "proportionate interest in the going concern" vis-a-vis a minority's "lack of control" in *Cavalier. See Rapid–American Corp. v. Harris*, Del.Supr., 603 A.2d 796, 806 n. 2 (1992); *Cavalier Oil Corp. v. Harnett*, Del. Supr., 564 A.2d 1137, 1145 (1989).

**9.** *See* DAVID A. DREXLER ET AL., DELAWARE CORPORATION LAW AND PRACTICE § 36.07 (1996).

going concern by the "majority acquiror;" during the transient period of a two-step merger, accrues to the benefit of all shareholders and must be included in the appraisal process on the date of the merger. *See Rapid–American Corp. v. Harris,* 603 A.2d 796; *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137; *cf. Walter W.B. v. Elizabeth P.B.,* 462 A.2d at 415.

■ In this case, the question in the appraisal action was the fair value of Technicolor stock on the date of the merger, January 24, 1983, as Technicolor was operating pursuant to the Perelman Plan. The Court of Chancery erred, as a matter of law, by determining the fair value of Technicolor on the date of the merger "but for" the Perelman Plan; or, in other words, by valuing Technicolor as it was operating on October 29, 1982, pursuant to the Kamerman Plan. By failing to accord Cinerama the *full proportionate value of its shares in the going concern on the date of the merger,* the Court of Chancery imposed a penalty upon Cinerama for lack of control. *Cavalier Oil Corp. v. Harnett,* 564 A.2d at 1145; *accord Rapid–American Corp. v. Harris,* 603 A.2d at 805–07; [10] *Bell v. Kirby Lumber Corp.,* 413 A.2d at 140–42.

The "accomplishment or expectation" of the merger exception in Section 262 is very narrow, "designed to eliminate use of *pro forma* data and projections of a speculative variety relating to the completion of a merger." *Weinberger v. UOP, Inc.,* 457 A.2d at 713. That narrow exclusion does not encompass known elements of value, including those which exist on the date of the merger because of a majority acquiror's interim action in a two-step cash-out transaction. *Cf. In re Shell Oil Co.,* 607 A.2d at 1218–19. "[O]nly the *speculative* elements of value that may arise from the 'accomplishment or expectation' of the merger" should have been excluded from the Court of Chancery's calculation of fair value on the date of the merger. *Weinberger v. UOP, Inc.,* 457 A.2d at 713 (emphasis added); *cf. In re Shell Oil Co.,* 607 A.2d at 1219.

The Court of Chancery's determination not to value Technicolor as a going concern on the date of the merger under the Perelman Plan, resulted in an understatement of Technicolor's fair value in the appraisal action. That result was inevitable when the Court of Chancery valued Technicolor pursuant to a discounted cash flow model with the negative factual input and assumptions from the Kamerman Plan rather than the Perelman Plan. Consequently, the Court of Chancery permitted MAF to "reap a windfall from the appraisal process by cashing out a dissenting shareholder [Cinerama]," for less than the fair value of its interest in Technicolor as a going concern on the date of the merger. *Cavalier Oil Corp. v. Harnett,* 564 A.2d at 1145.

■ Cinerama has asked this Court to make an appraisal of the fair value of its Technicolor shares on the date of the merger, rather than remand this protracted litigation to the Court of Chancery. This Court will not make an independent determination of value on appeal. *Rapid–American Corp. v. Harris,* 603 A.2d at 799. This appraisal action will be remanded to the Court of Chancery for a recalculation of Technicolor's fair value on the date of the merger. *See id.*

Upon remand, it is within the Court of Chancery's discretion to select one of the parties' valuation models as its general framework, or fashion its own, to determine fair value in the appraisal proceeding. *See Rapid–American Corp. v. Harris,* 603 A.2d at 804. The Court of Chancery has properly recognized that its choice of a framework does not require it to adopt any one expert's model, methodology, or mathematical calculations *in toto. See id.* The undervaluation in this appraisal proceeding resulted from negative factual assumptions that originated from an erroneous legal theory, not from either the valuation framework selected or adaptions to it by the Court of Chancery. In that regard, however, we have concluded that the Court of Chancery's erroneous majority acquiror principle and proximate cause exception permeated its factual assumptions so

---

**10.** The mandate to value the dissenters' proportionate share in the corporation as a "going concern" taking into account all other relevant factors affecting value *precludes* an adjustment of valuation "to reflect a shareholder's individual interest in the enterprise." *Rapid–American Corp. v. Harris,* 603 A.2d at 805.

pervasively, that the Court of Chancery's attribution of only a $4.43 per share value difference between the Perelman Plan and the Kamerman Plan should not be considered the law of this case upon remand.

## Law of Case
### Perelman Plan is Valuation Element

■ The Court of Chancery's majority acquiror principle and proximate cause exception for two-step mergers are also contrary to the law of this case, as set forth in *Technicolor I*. *See Technicolor I*, 542 A.2d at 1186–87 & n. 7. In *Technicolor I*, this Court provided specific guidance regarding the application of *Weinberger's* holdings to the trial of Cinerama's consolidated appraisal and personal liability actions. *Id.* at 1186–88. We began by emphasizing that upon remand, the *Weinberger* " 'liberalized approach' to appraisal shall be used to determine the value of a cashed-out minority's [Cinerama's] share interest *on the day of the merger, reflecting all relevant information regarding the company [Technicolor] and its shares.*" *Id.* at 1187 (emphasis added).

In an effort to convey this Court's comprehensive interpretation of the statutory "all relevant information," we recognized in *Technicolor I* "that the majority [MAF] may have insight into their company's [Technicolor's] future based primarily on bits and pieces of *nonmaterial* information that have value as a totality." *Id.* at 1187 n. 8. Consequently, in *Technicolor I*, we said "[i]t is this information that, if available in a *statutory appraisal proceeding*, the Court of Chancery *must* evaluate to determine if future earnings will affect the fair value of shares on the day of the merger." *Id.*[11] (emphasis added) (citing 8 *Del.C.* § 262(h)). This Court reinforced the relevance of such information to the appraisal action, independent of the personal liability action, stating "[t]he issue we are addressing is not the manipulation of the

transaction, nor the suppression or misstatement of *material* information by insiders defrauding the market." *Id.*[12] (citations omitted). Thus, the law of this case required the Court of Chancery to consider nonspeculative information about the Perelman Plan.

The record is replete with information about Technicolor's future that was known on the date of the merger. *Cf. Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 941–42 (1985). MAF's October 18, 1982 financing package presented to the lending banks, Chase Manhattan Bank and Bank of America, contemplated that MAF would realize $50 million in net proceeds from the sale of assets by the end of 1983. Moreover, the loan agreement between MAF and the banks specifically identified OHP, CPPD, Gold Key and Audio Visual as assets which could be sold by MAF on behalf of Technicolor.

The Court of Chancery found that as of the date of the merger one "would not have projected" that Technicolor would retain OHP and the other businesses (CPPD, Gold Key and Audio Visual) that Perelman had designated for elimination. Following this remand, Technicolor must be viewed and valued "as an on-going enterprise, occupying a particular market position in the light of future prospects." *In re Shell Oil Co.*, Del. Supr., 607 A.2d 1213, 1218 (1992). All "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may [and should] be considered." *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 713 (1983); *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d at 940; *cf. In re Shell Oil Co.*, 607 A.2d at 1219.

## Evidentiary Issues

■ Cinerama has raised several evidentiary contentions which we will address brief-

---

11. In *Technicolor I*, recognizing the potential for investor harm in cash-out transactions, this Court held that *Cinerama* was entitled to *discovery* in the *appraisal* proceeding to obtain this information. *Technicolor I*, 542 A.2d at 1187 n. 8; *cf.* Randall S. Thomas, *Improving Shareholder Monitoring of Corporate Management by Expanding Statutory Access to Information*, 38 Ariz. L.Rev. 331 (1996).

12. In *Technicolor I*, this Court noted that a "determination of fair value does not involve an inquiry into claims of wrong-doing in the merger." *Technicolor I*, 542 A.2d at 1189; *accord Cavalier Oil Corp. v. Harnett*, Del.Supr., 564 A.2d 1137, 1143 (1989).

ly because this matter will be remanded for further proceedings. Cinerama argues that the Court of Chancery's reliance upon the stock market price of Technicolor's shares in September 1982 was improper for two reasons: first, that price reflected the market's negative opinion of the Kamerman Plan; and, second, the market never had an opportunity to price Technicolor stock in the context of the Perelman Plan. This Court has recognized that the "market price of shares may not be representative of true value." *Paramount Communications, Inc. v. Time Inc.*, Del.Supr., 571 A.2d 1140, 1150 n. 12 (1989). Moreover, in this case, we noted that "[i]nformation and insight not communicated to the market may not be reflected in stock prices." *Technicolor I*, 542 A.2d at 1187 n. 8. Nevertheless, Cinerama's objection goes to the weight, if any, to be given to the stock market price for Technicolor stock in September 1982, rather than its admissability. *See In re Delaware Racing Ass'n,* Del.Supr., 213 A.2d 203, 211 (1965); *cf. Rapid-American Corp. v. Harris,* Del.Supr., 603 A.2d 796, 806 (1992) (rejecting *"exclusive* reliance upon market value in an appraisal action"). Upon remand, Cinerama can renew its argument that the September 1982 stock market price was of little significance to the issue of fair value on the date of the merger in January 1983.

■ Cinerama also argues that the Court of Chancery "erroneously considered the decision of the Technicolor directors to accept MAF's offer and the fairness opinion solicited by Technicolor from its investment banking firm in response to that offer in determining Technicolor's fair value." We have concluded that, given the statutory mandate to consider "all relevant factors," these objections are also directed at the weight, rather than the admissibility, of this evidence. 8 *Del.C.* § 262(h); *see Rosenblatt v. Getty Oil Co.,* 493 A.2d at 940. Upon remand, Cinerama can renew its argument that this evidence should be given little weight because of its temporal remoteness to the date of the merger.

Cinerama's last two evidentiary contentions both relate to the "inputs" relied upon by the Court of Chancery in its valuation framework. We are unable to determine from the record how much of the "input" accepted by the Court of Chancery was predicated upon its erroneous legal theory and how much was properly attributable to its assessment of credibility or a weighing of the evidence. *See Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1146 (1989); *cf. Rapid-American Corp. v. Harris,* 603 A.2d at 802; *Alabama-By-Products Corp. v. Neal,* Del.Supr., 588 A.2d 255, 259 (1991). Therefore, upon remand, Cinerama should be afforded an opportunity to renew all of its formulaic and factual arguments regarding valuation before the recalculation of fair value is made by the Court of Chancery.

## Interest Rate and Costs

■ Cinerama argues that it should have been awarded compound interest from the date of the merger until the date of payment. The Court of Chancery is vested with discretion to award simple or compound interest. 8 *Del.C.* § 262(i). The record reflects no abuse of discretion in the Court of Chancery's decision to award simple interest. *See Rapid-American Corp. v. Harris,* Del.Supr., 603 A.2d 796, 808 (1992). Like any other discretionary act, that matter may be reconsidered upon remand.

■ Cinerama also argues that the Court of Chancery erred by denying full reimbursement of its expert witness costs. Section 262(j) provides that "[t]he costs of the [appraisal] proceeding may be determined by the Court [of Chancery] and taxed upon the parties as the Court deems equitable in the circumstances." 8 *Del.C.* § 262(j). In the absence of an equitable exception, the plaintiff in an appraisal proceeding should bear the burden of paying its own expert witnesses and attorneys. *In re Radiology Assocs., Inc. Litig.,* Del.Ch., 611 A.2d 485, 501 (1991); *see also Goodrich v. E.F. Hutton Group, Inc.,* Del.Supr., 681 A.2d 1039 (1996); S. Samuel Arsht & Lewis S. Black, *Analysis of the 1976 Amendments to the Delaware General Corporation Law,* 3 *Corporation* 387, 393 (Prentice-Hall 1976). The record supports the Court of Chancery's decision not to invoke its equitable authority to award expert witness fees to Cinerama.

### Conclusion

The judgment of the Court of Chancery in the appraisal action is reversed. This matter is remanded for further proceedings in accordance with this opinion.

### Upon Motion for Reargument

Cinerama filed a Motion for Limited Reargument. In that motion, Cinerama urges this Court to supplement its opinion by holding that there is no legal bar to an award of post-judgment compound interest in an appraisal. Technicolor filed a response, at the Court's request. In its response, Technicolor acknowledges that it construes this Court's opinion to hold that the Court of Chancery is vested with discretion to award either simple or compound post-judgment interest.

Technicolor's construction of this Court's holding is correct. An award of compound post-judgment interst is the exception rather than the rule. Nevertheless, the Court of Chancery may, in the exercise of its discretion, award compound post-judgment interest in an appraisal proceeding. *See Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796, 808 (1992); *Summa Corp. v. Trans World Airlines, Inc.,* Del.Supr., 540 A.2d 403 (1988). This restatement of the law will constitute the Court's action on the Motion for Limited Reargument and will be added to the original opinion.