Jim ALLENSON; B & W Investment; H. Barry Baker, M.D.; Michael Blonstein; Edward M. Burke; Howard W. Carroll Trust; Ira Carroll; Earl Carroll; Michael Cavanaugh; Chicago Air Partners; Jeff Fine; Sue Gin; Jerome Gold; Michael H. Gold; Robert J. Gold; Frances Goldberg; Gary Greenbaum; Houston Air Partners; Nathan Jacobson; Stuart Kaufman; James Krainson; Mark Kugler; Richard Levine; Melvin Levinson; Michael Levinson; Brian Olds; Donald Rutz; Kenneth Sain; Kenneth Sain, Jr.; Mark Summers; Debra Susskind; TSP Partnership; Wally Weber; and Harvey Weindenfeld; Petitioners,

v.

MIDWAY AIRLINES CORPORATION, Respondent.

C.A. No. 15734–NC.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 15, 2001.
Decided: July 6, 2001.

David J. Margules and Joanne P. Pinckney of Bouchard, Margules & Friedlander, Wilmington; and Steven H. Cohen and Robin L. Wolkoff of Patzik, Frank & Samotny, Ltd., Chicago, Illinois, for Petitioners.

Gregory V. Varallo, C. Malcolm Cochran, IV and Dominic T. Gattuso, of Richards, Layton & Finger, P.A., Wilmington, for Respondent.

## *OPINION*

JACOBS, Vice Chancellor.

This is the decision of the Court, after a trial based on stipulated facts, adjudicating the merits of this statutory appraisal proceeding. The parties present a single issue that arises out of the core facts next summarized.

The corporation that is the subject of this appraisal is in dire financial condition. It cannot avoid bankruptcy without a sub-

stantial infusion of new capital. The only person willing to invest that capital is an unrelated party, but it will invest but only if two conditions are met. First, the corporation's key creditors must agree to certain operational cost concessions in an amount satisfactory to the outside investor ("the Concessions"). Second, the corporation's majority stockholder must also agree (i) to invest new capital, as well as forgive certain debts that the corporation owed the majority stockholder, as well as (ii) relinquish certain of the majority stockholder's other claims against the corporation.

The majority stockholder, the corporation's key creditors, and the outside investor reached an agreement that would accomplish those conditions. The agreement contemplates a recapitalization that will take the form of a merger of the corporation into a new entity. Sixty-seven percent (67%) of the equity of the merged entity would be owned by the outside investor, and twenty-two percent (22%) would be owned by the majority stockholder. The public shareholders would not participate in the merged entity. Instead, they would be "cashed out" for nominal consideration—$0.01 per share. The agreements to grant the Concessions, although in place before the effective date of the merger, expressly make the Concessions contingent upon, and operative only if and when, the merger becomes effective.

If the Concessions are included in determining the corporation's "fair value" under 8 *Del. C.* § 262, then "fair value" would exceed the $0.01 per share merger price. The sole issue presented is whether, in these circumstances, the Concessions are an "element of value" that may be considered in determining the corporation's statutory fair value on the date of the merger. For the reasons set forth in this Opinion, I conclude that they cannot be.

## I. RELEVANT FACTS

What follows is a summary of the relevant facts to which the parties have stipulated. On February 11, 1997, Midway Airlines Corporation, a Delaware corporation ("Midway" or "the Company"), merged with and into Good Aero, Inc. ("GoodAero"), a Delaware corporation specially formed for purposes of the merger by Messrs. James A. Goodnight, Ph.D. ("Goodnight") and John P. Sall ("Sall"). On that date, the Company also mailed a notice to its stockholders, advising them that the merger had become effective on February 11, 1997, and that each of their shares had been converted into the right to receive $0.01 per share cash. The petitioners are holders of Midway's Prior Preferred, Junior Preferred and Class C shares. They commenced this appraisal proceeding, contending that the merger consideration was inadequate because it failed to include relevant elements of fair value—namely, the Concessions—as required by 8 *Del. C.* § 262(h) and Delaware decisional law.[1]

### A. Background

Formed in 1993, Midway initially provided air service from a base at Midway Airport in Chicago, Illinois, and operated as a high volume discount, all-coach carrier. In 1994, Midway became financially distressed and was recapitalized by the Zell/Chilmark Fund, L.P. ("Z/C") making a $25 million investment. In exchange, Z/C received shares of Midway Prior Preferred and Class A Common stock, with the re-

---

1. The petitioners also filed a separate breach of fiduciary duty action alleging various breaches of fiduciary duty against Midway, its new and former majority stockholders, and its former board of directors. *Allenson, et al. v. Midway Airlines, et al.,* C.A. No. 18045.

sult that Z/C owned 96.6% of Midway's Prior Preferred and 87.1% of the Company's Class A shares on a fully diluted basis.

On March 2, 1995, Midway moved its operations to Raleigh–Durham International Airport, and changed its focus from providing high volume discount flights to offering premium, full-fare airline service to business travelers from the new Raleigh–Durham Airport base. To facilitate its growth in this new direction, Midway entered into agreements with Airbus Industries and AVSA, S.A.R.L. (collectively, "Airbus") to purchase four Airbus A320 aircraft outright, and for an option to purchase four more A320 aircraft at specified future delivery dates. Midway also leased a fifth Airbus A320, and acquired six additional Fokker F100 aircraft, from Kawasaki Aircraft Leasing ("Kawaski"). By mid–1995, this expanded fleet enabled Midway to provide airline services to several major metropolitan cities on the east coast, as well as Las Vegas, Los Angeles and Cancun, Mexico.

In May 1995, Z/C and other stockholders invested an additional $6 million of capital in Midway. In exchange, they received subordinated notes having a face value of $6 million due in April 2002. Even with that capital infusion, the Company had exhausted its operating cash by December 1995. In late 1995, anticipating cash flow shortages in 1996, Midway began negotiating with its key creditors and vendors, including American Airlines, Inc. ("AMR"), debis AirFinance B.V. ("debis") and Airbus (collectively, the "Key Creditors"), to defer debt payments the Company was obligated to make to those creditors. Midway sought the deferrals to give itself sufficient time to engage in a capital-generating transaction.

## B. Midway Negotiates The 1996 Spring Deferrals With Its Key Creditors

After months of intense negotiations, the Key Creditors granted deferrals to Midway in early 1996 (the "1996 Spring Deferrals"). In April 1996, AMR agreed to defer a total of $6 million until September 30, 1996, for which Midway surrendered substantially all of its assets to collateralize the deferred debt.

As a condition to participating in the 1996 Spring Deferrals, AMR demanded that Midway's other Key Creditors grant similar deferrals. AMR also demanded that Z/C invest an additional $4 million in exchange for new Midway subordinated securities, and defer any interest and dividends on those securities until September 30, 1996. Z/C agreed to, and did, invest the additional $4 million in Midway in exchange for additional subordinated notes of Midway.

In January 1996, Midway management also met with representatives of debis (the creditor that was leasing the Fokker F100 aircraft to Midway) to negotiate deferrals of certain lease payments on those aircraft. debis agreed to defer the February, March and April 1996 aircraft lease payments, and to refinance the December 1995 and January 1996 lease payments. Like AMR, debis conditioned its deferrals upon similar deferrals by Midway's other Key Creditors.

Thus, in the 1996 Spring Deferrals Midway obtained $4 million in additional capital from Z/C, and obtained significant debt deferrals from its Key Creditors and vendors. Unfortunately, even the Spring 1996 Deferrals offered the Company only short-term relief from its financial difficulties.

## C. Midway Negotiates For Additional Deferrals While Seeking New Capital

In June 1996, the Company's outside auditor issued its audit report of Midway's

1995 financial statements. The report contained a "going concern" qualification, namely, that Midway's financial condition raised substantial doubt as to its ability to continue as a going concern. At that point Z/C advised Midway that it would no longer act as the Company's "lender of last resort." Those developments caused Midway's Board of Directors to decide to sell the Company or engage in a significant capital raising transaction. But, to enable Midway to continue operating while it searched for a buyer or financial partner, additional deferrals from creditors had to be obtained.

### 1. The Company Searches For A New Capital Infusion

Midway began its search for new capital by contacting and interviewing five national investment banking firms to represent the Company. Presumably because of its poor financial condition, none of those firms was willing to represent Midway. Accordingly, Midway utilized its own internal resources, as well as those of Z/C, to identify potential buyers or capital investors. Steven Westberg, Midway's Chief Financial Officer, and Greg Robitaille, representing Z/C, took the lead role in that effort. Aided by Z/C's representatives, Midway contacted over fifty different parties in an effort to solicit interest, but only two entities, People's Express Airlines and Smith Management Group, expressed any interest. Moreover, People's Express withdrew its offer by September 1996, and the Smith Management Group was willing to invest in Midway only if Midway would agree to go through bankruptcy. Because Midway's board determined that the Company would likely not survive a bankruptcy proceeding, Midway rejected the Smith Group's offer.

Only later did a third entity—GoodAero—emerge. It did so in the following circumstances: In May 1996, Mr. Robert Ferguson, a seasoned airline industry executive, was asked by an investor named Carl Pohlad to consider Midway as a potential investment opportunity. Messrs. Ferguson and Pohlad attended a meeting where Mr. Westberg made a presentation about Midway. After that meeting, Mr. Ferguson told Mr. Pohlad that in his (Ferguson's) view, Midway might be a viable investment, assuming that certain improvements were made to Midway's balance sheet and that Z/C would agree to restructure its debt and equity position. In September 1996, Mr. Westberg introduced Mr. Ferguson to the Chief Financial Officer of SAS Institute, a North Carolina-based software company owned by Messrs. Goodnight and Sall. That began a process which concluded with Messrs. Goodnight and Sall (through GoodAero) eventually becoming the majority acquirors of a recapitalized Midway.

### 2. GoodAero Emerges As The Only Viable Merger Candidate

On September 27, 1996, Messrs. Goodnight and Sall, through GoodAero, made an offer to acquire Midway for $20 million.[2] That proposal resulted from Ferguson recommending to the GoodAero group that it invest in Midway on the condition that Midway's Key Creditors provide certain concessions. Adopting Mr. Ferguson's recommendation, GoodAero offered to negotiate a possible investment in Midway conditioned upon its obtaining (among other things) a satisfactory level of operating cost concessions from Midway's Key Creditors.

**2.** Messrs. Goodnight and Sall advised Midway that they anticipated that Mr. Ferguson would become the Chief Executive Officer of Midway upon its acquisition.

Between October and mid-December 1996, representatives of Midway and Z/C, assisted by Mr. Ferguson, negotiated to obtain the Concessions from AMR and debis that Ferguson believed were needed if he was to recommend that GoodAero invest in Midway. During this period, a cash flow shortage forced Midway's management to seek further deferrals from the Key Creditors, this time to give the Company breathing room to negotiate a merger and recapitalization with GoodAero.

### 3. Midway Negotiates With Key Creditors To Obtain The Fall 1996 Deferrals

At a meeting held on June 25, 1996, Midway management advised its creditors that it could not meet its liability payment schedule, and that it required a new infusion of capital and a restructuring of its obligations to creditors. To demonstrate its need for additional capital, Midway disclosed to the Key Creditors cash flow projections that showed a negative $7 million in cash flow for the third quarter of 1996.

Essential to Midway's continued survival was the willingness of debis, as a significant Midway creditor, to grant additional deferrals. But debis was unwilling to grant additional deferrals, unless Z/C first provided another capital infusion and Midway's other creditors and vendors agreed to similar deferrals.

By September 1996, Z/C and Midway's creditors and vendors, including debis and AMR, had agreed to grant certain additional deferrals (the "1996 Fall Deferrals").[3] Z/C also agreed to provide $7 million of substitute collateral to First Bank Systems to obtain a partial release to Midway of Midway's cash credit card holdback, which was then being held in escrow.

On September 27, 1996, Midway secured Airbus' participation in the 1996 Fall Deferrals. That participation involved Airbus deferring over $8 million of payments on two promissory notes, including the $6 million secured promissory note earlier granted as part of the 1996 Spring Deferrals.[4]

### D. The Merger Negotiations

Having secured the Fall 1996 Deferrals, Midway continued negotiating with its Key Creditors to obtain Concessions at a level that would be acceptable to GoodAero and would position Midway to consummate a merger with GoodAero. Between September and December 1996, Messrs. Westberg, Robitaille and Ferguson communicated with the Key Creditors on several occasions. Throughout this negotiation period, GoodAero was unwavering in its demand that the Concessions be agreed to before it (GoodAero) would invest in Midway.

### 1. The October Letter of Intent

On October 28, 1996, GoodAero, Z/C and Midway executed a Letter of Intent to effect a recapitalization of Midway (the "October LOI"). The October LOI called for a merger and recapitalization that was expressly conditioned upon obtaining Concessions from the Key Creditors at a level satisfactory to GoodAero, in its sole discretion. To facilitate the process, Midway developed a series of projections which showed the positive effect that various Concessions and other cost-cutting measures would have on Midway's future prospects. The projections—arrived at by taking the Company's core operating costs

---

**3.** The 1996 Spring and Fall Deferrals were not part of the Concessions at issue here.

**4.** debis and its affiliates executed agreements deferring rent payments due and owing on the Company's 12 Fokker F100s. These deferrals were not part of the Merger terms.

and plugging in, and pulling out, various assumptions reflecting the impact of the Concessions and other cost cutting measures then being negotiated—were used as an ongoing tool to assess whether those Concessions would be satisfactory to GoodAero.

Between November 1996 and January 31, 1997, Midway prepared several iterations of the projections, which tracked the negotiations then taking place with the Key Creditors and other creditors, and which reflected the judgments of Messrs. Westberg, Ferguson and Robitaille as to what might be achievable in the negotiations.

### 2. GoodAero Terminates The October LOI, And Midway Prepares A Bankruptcy Filing

On December 6, 1996, GoodAero terminated the October LOI, because Midway had not obtained satisfactory concessions from the Key Creditors. By this point, Z/C had engaged a law firm to advise it on strategies for Midway's future, including possible bankruptcy strategies. The law firm provided preliminary draft form bankruptcy papers for use by the Company in the event Z/C and Midway decided to elect the bankruptcy option.[5] Ultimately, however, the bankruptcy option was averted because the parties resumed negotiations that led to a new letter of intent.

On December 13, 1996, Mr. Rod Dammeyer, Z/C's Managing Director, sent to AMR and debis a letter that included projections showing the effect of the requested Concessions on the Company's future financial position. These projections also showed Midway's cash-strapped financial position without the Concessions. After receiving Mr. Dammeyer's letter and the projections, AMR and debis agreed to reopen negotiations. Ultimately, that led to Midway and GoodAero entering into a new letter of intent.

### 3. The December Letter of Intent

On December 26, 1996, GoodAero and Midway executed a second letter of intent (the "December LOI"). The December LOI expressly conditioned GoodAero's participation in the merger on Midway's obtaining the Concessions from the Key Creditors that were described in an attachment to the document. GoodAero also required that Z/C: (i) invest an additional $7 million in Midway, (ii) cancel all of Midway's subordinated notes then being held by Z/C, (iii) pay off all non-Z/C subordinated note holders, and (iv) cancel its pre-merger equity position for no consideration.

On January 17, 1997, GoodAero entered into a written Merger Agreement that would provide Midway with $22 million in new capital. By January 31, 1997, debis and AMR had agreed in writing to provide the Concessions to Midway, contingent upon the merger. AMR and debis advised Midway, Z/C, and GoodAero that those Concessions would not become effective unless and until the merger was consummated. The parties have stipulated that debis and AMR would not have made the Concessions without the merger, and that GoodAero would not have made its investment without the Concessions.

---

**5.** As of December 31, 1996, the Company's liabilities substantially exceeded its tangible assets. As of that date, Midway's net worth, on an unaudited basis, was negative $38.9 million. Likewise, the Company had sustained operating losses of over $25 million during 1995, and more than $6 million during 1996. By year-end 1996, the current liabilities of the Company exceeded current assets by more than $32 million. Prior Preferred liquidation preferences and accumulated but unpaid dividends increased this deficit to $72 million on an unaudited basis.

### E. The Merger Closes On February 11, 1997

On February 11, 1997, GoodAero and Z/C jointly infused $22 million of new capital into the Company, and GoodAero was merged into Midway. The merger was made contingent upon the Concessions being granted by AMR and debis, and also upon certain agreements by Z/C, all of which are next described.[6]

### 1. AMR Concessions

The final Concessions to which AMR agreed were:

- converting approximately $9.45 million of payments previously deferred by AMR (which include the $6 million AMR Deferral given as part of the 1996 Spring Deferrals and $3 million in deferrals granted in connection with the 1996 Fall Deferrals) into an 8% note payable with a seven-year maturity;
- reducing the Raleigh–Durham Airport gate sublease rent by $150,000 per month;
- extending the Raleigh–Durham Airport gate sublease option for two additional years at 67% of the previous rental rate;
- giving Midway an option to sublease surplus unused space for $5 per square foot per annum;
- reducing selected operating agreements, including multi-host and ground handling, to achieve a savings to Midway in excess of $720,000 per year;
- releasing Midway from its maintenance contract; and
- permitting Midway to terminate the Sabre Multi-host program upon one year's notice.

### 2. debis Concessions

The final Concessions to which debis agreed were:

- setting off $3.2 million of security deposits against $8.7 million of deferred rents and converting the remaining $5.5 million into an 8% note payable with a seven-year maturity;
- reducing rent on all 12 of the Fokker F100 aircraft from $211,000 per month to $175,000 per month, with no future rent increase allowed (debis, however, also having the right to terminate the leases on six month's notice);
- reducing the insured value of the F100s, other than the four planes under U.S. leveraged leases, to $22 million per aircraft, with a $500,000 deductible and a minimum cash balance of $5 million; and
- requiring no additional security deposits.

To reiterate, AMR and debis agreed to these Concessions on the condition that GoodAero and Z/C invest a total of $22

---

6. In exchange for its additional $7 million investment and the cancellation of its entire equity stake in the existing pre-merger Company, together with the concessions enumerated below, Z/C received a 22% minority equity position in the reorganized company. The concessions to which Z/C agreed to included: (i) forgiveness by Z/C of 100% of the subordinated debt Midway owed to Z/C (approximately $9.2 million, plus $1.3 million of accrued interest); (ii) payment by Z/C of 100% of the subordinated debt owed by Midway to other parties ($783,000, plus approximately $33,100 of accrued interest); (iii) payment by Z/C of approximately $1.3 million of obligations incurred by Midway in connection with the Merger; (iv) payment by Z/C from its own funds of the costs and expenses (including attorneys' fees) incurred by Z/C and certain costs and expenses of Midway in connection with the Merger; and (v) provision of certain indemnities to Midway and the GoodAero investors.

million in new cash. GoodAero, for its part, agreed to make its cash infusion only after the Concessions were in effect Thus, the Concessions would not have been granted to Midway absent the merger, and GoodAero would not have consummated the merger without AMR's and debis's agreement to the Concessions.

As earlier noted, Midway's public shareholders did not participate in the recapitalized post-merger Midway, but instead were cashed out at $0.01 per share. This appraisal proceeding followed. According to the plaintiffs, ten months after the merger, Z/C sold 84% of its new shares in Midway for $23 million; and shortly thereafter, Z/C sold its remaining new Midway shares in the public market for $4,350,000.

## II.  THE PARTIES' CONTENTIONS

As earlier noted, this case presents a single question, which is whether in the above-described circumstances, this Court can take the Concessions into account in determining the statutory fair value of Midway on the date of the merger. This issue is stated abstractly, because the parties have not disclosed the per share value of the Concessions on the record, nor have they asked the Court to determine a specific fair value for the Company or its shares. Presumably, that is because the parties have agreed that my determination of the legal issue will enable them to agree on the fair value of the dissenters' Midway stock without further judicial intervention.

### A.  The *Cede IV* Case

The issue presented requires a determination of the proper application of a recent Delaware Supreme Court precedent—*Cede*

& Co. v. Technicolor, Inc.[7] ("*Cede IV*")—to the facts of this case. Because of the centrality of that decision to the parties' positions and to the Court's analysis, a somewhat extended discussion of *Cede IV* is required.

*Cede IV* was the latest Supreme Court decision in an appraisal proceeding that arose out of a 1983 cash-out merger of Technicolor Incorporated ("Technicolor") and MacAndrews & Forbes Group Incorporated ("MAF"), which was Technicolor's then-majority stockholder. As a result of the merger, the minority shareholders of Technicolor were cashed out at $23 per share. The merger was the second step of a two-step, arms-length-negotiated acquisition of Technicolor by MAF under a merger agreement. The first step was an all-cash tender offer by MAF at the same $23 per share price, which resulted in MAF owning over 82% of Technicolor's stock. The second step (the cash-out merger) occurred two months later, and eliminated the remaining 18% minority interest, leaving MAF as the 100% owner of the merged corporation.

After the merger, a minority stockholder of Technicolor commenced an appraisal proceeding,[8] contending that the statutory fair value of Technicolor far exceeded the $23 per share merger price. Former Chancellor Allen disagreed, finding that the fair value of Technicolor common stock on the merger date was $21.60 per share— $1.40 per share less than the merger price. The dissenting stockholder appealed, contending that the Chancellor had erred as a matter of law by refusing to include MAF's business plan and strategy for Technicolor in the valuation calculus. That business plan (referred to as the

---

**7.**  Del.Supr., 684 A.2d 289 (1996).

**8.**  That same shareholder also commenced a companion class action, attacking the merger on breach of fiduciary duty grounds. The

class action litigation, now terminated, was also a subject of Supreme Court review on multiple occasions.

"Perelman Plan")[9] had been developed, adopted, and implemented between the date of the Merger Agreement and the date of the merger. The Perelman Plan, the dissenting stockholder argued, had significant value the inclusion of which was legally required in determining Technicolor's statutory fair value.

The Perelman Plan contemplated a sale of all of what MAF regarded as Technicolor's excess assets. Immediately upon acquiring control of Technicolor, Mr. Perelman and his associates began implementing that plan, by seeking buyers for several of the Technicolor divisions and by MAF retaining Bear Stearns & Co. to assist in selling those assets. The second step merger took place on January 24, 1983, approximately eight weeks after MAF had acquired control. In a financing package presented to its bank lenders on October 18, 1982, MAF indicated that it would realize $50 million in net proceeds from the sales of assets by year-end 1983. As of December 31, 1982, two months later and less than four weeks before the merger, MAF was projecting that $54 million would be realized from those asset sales.

The dissenting stockholder argued that because the Perelman Plan governed the operation of Technicolor on the merger date, that Plan had to be taken into account in projecting net cash flow for purposes of arriving at Technicolor's statutory fair value. Technicolor asserted two contrary arguments, one factual and the other legal. The factual argument was that the Perelman Plan was not sufficiently defined as of the merger date to form a reliable factual premise for projecting cash flow from asset sales. The Chancellor rejected

that argument, finding as fact that the Perelman Plan was fixed as of the merger date. That ruling was not appealed.

Technicolor's legal argument, and the one that is critical for our purposes, was that in all events any value attributable to the Perelman Plan was required by statute to be excluded, because it represented an "element of value arising from the accomplishment or expectation of the merger...."[10] To that argument the dissenting stockholder responded that the Supreme Court in *Weinberger v. UOP, Inc.*[11] had construed the scope of that statutory language narrowly, to exclude "[o]nly the speculative elements of value that may arise from the 'accomplishment or expectation' of the merger." The *Weinberger* Court went on to hold that "elements of future value... which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered."[12] Under that construction (the dissenting stockholder argued) any provable, nonspeculative element of future value may be considered, even if it was an "element of value arising out of the accomplishment or expectation of the merger." Therefore, because on the date of the merger the Perelman Plan was known, susceptible of proof, and not the product of speculation, it must be considered in determining Technicolor's fair value.

The Chancellor rejected the petitioner's argument. Although he acknowledged that that argument appeared persuasive based on the quoted language from *Weinberger,* the Chancellor nonetheless concluded that the Petitioner's reading of *Weinberger* could not be squared with the

9. The Perelman Plan was named after Ronald O. Perelman, MAF's controlling stockholder.

10. 8 *Del. C.* § 262(h).

11. Del.Supr., 457 A.2d 701 (1983).

12. *Id.,* 457 A.2d at 713.

plain words of the statute, *unless* the relevant *Weinberger* language were qualified further to require that "but for the merger, such elements of future value would not exist." That is, the Chancellor concluded that "future value that would not exist but for the merger... even if it is capable of being proven on the date of the merger," cannot be considered in a Delaware statutory appraisal proceeding.[13] Because the Perelman Plan would not have existed but for the merger, the Court held that any value attributable to that Plan could not be considered.

On appeal the Supreme Court reversed, holding that its interpretation of § 262(h) in *Weinberger* was controlling, and that the Chancellor's "but-for-the-merger" gloss was inconsistent with that statutory interpretation. The Supreme Court pointed out that in *Weinberger* it had held that the "very narrow [statutory] exception was designed to eliminate use of *pro forma* data and projections of a speculative variety relating to the completion of the merger," but that:

> elements of future value, including *the nature of the enterprise,* which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered.[14]

Having determined that the Perelman Plan could not be excluded from consideration on the basis that it would not have existed but for the merger, the Supreme Court then addressed the only remaining issue, which was whether the Perelman Plan was impermissibly speculative. The Court held that it was not, because (as the Chancellor had found), the Perelman Plan was the "operative reality on the date of the merger...."[15] and was clearly known,

susceptible of proof, and was being implemented. Therefore, any value attributable to the Perelman Plan had to be considered. Importantly, the Court also held:

> In a two-step merger, to the extent that value has been added following a change in majority control before cash-out, it is still value attributable to the going concern, *i.e.,* the extant "nature of the enterprise," on the date of the merger.... [V]alue added to the going concern by the "majority acquiror," during the transient period of a two-step merger, accrues to the benefit of all shareholders and must be included in the appraisal process on the date of the merger.... That narrow exclusion [of elements of value arising from the accomplishment or expectation of the merger] does not encompass known elements of value, including those which exist on the date of the merger because of a majority acquiror's interim action in a two-step cash-out transaction.[16]

## B. The Contentions

The Petitioners in this case contend that *Cede IV* requires that the value of the Concessions granted to Midway by the Key Creditors must be taken into account in determining Midway's fair value on the merger date. Specifically, the Petitioners argue that as of the merger date the Concessions were known, were "fixed" in the sense that before the merger date they had been contractually agreed upon, and for those reasons were clearly susceptible of proof and not speculative. That (Petitioners argue) is all that *Cede IV* requires, and accordingly, even though the Concessions would not have occurred "but for"

---

**13.** 684 A.2d at 296.

**14.** 457 A.2d at 713 (quoted in 684 A.2d at 297) (emphasis added)

**15.** 684 A.2d at 298.

**16.** *Id.,* at 298–99.

the merger, that fact is legally irrelevant because as of the merger date the Concessions were part of Midway's "operative reality." In advancing this argument, the Petitioners liken the Concessions in this case to the Perelman Plan in *Cede IV*,. and contend that from an analytical standpoint the Concessions and the Perelman Plan are indistinguishable.

Midway, not surprisingly, hotly disputes this argument based upon a quite different view of *Cede IV* and its application to this case. Midway contends that the critical test under *Cede IV* for determining whether the Concessions are an includable element of appraisal value, is *not* whether the Concessions were known or reasonably foreseeable on the merger date. Indeed, Midway concedes that the Concessions were known and foreseeable, but it argues that as of the merger date the Company or its controlling stockholder must also have had the power to implement the Concessions unilaterally. If not, then the business plan cannot be regarded as part of the value of the enterprise that is being appraised. Here, Midway argues, neither the Company nor Z/C had the unilateral power to implement the Concessions before the merger became effective, and hence, the value of the Concessions was not an includable element of Midway's going concern value as of the merger date.

More specifically, the Respondent argues that unlike *Cede IV*, where MAF was fully able unilaterally to implement the Perelman Plan before the merger, here only AMR and debis had the power to make the Concessions a reality, and were willing to do so only if Good Aero and Z/C invested $22 million of new capital and the merger became effective. For their part, GoodAero and Z/C were willing to invest only on the cross-condition that the Key Creditors grant those Concessions. Thus, because the Concessions were not "in

place" on the merger date, and would not become available to Midway until after the Merger became effective, they were not part of the "nature of the enterprise" or its "operative reality"on the date of the merger.

These contentions frame the issue that this Court must decide. For the reasons next discussed, I conclude that it is legally impermissible to consider or include any value attributable to the Concessions in determining the statutory "fair value" of Midway.

## III. ANALYSIS

Resolving the issue presented has proved difficult, because this Court is required to determine the proper application of *Cede IV* to a case that involves markedly dissimilar facts, and because the parties cannot agree upon the appropriate analytical framework to decide that issue. Further complicating this task is that the argument advanced by one side addresses the issue on only a surface, verbal level, while the position of the opposing party finds factual, but not legal, support in *Cede IV*. Ultimately, the Court adopts the position of neither side and arrives independently at what it regards as *Cede IV*'s core teaching and its proper application to these unique facts.

### A. The Petitioners' Vision of *Cede IV*

The virtue of the Petitioner's argument is that it is easy to articulate and that it rests on undisputed facts. The argument is that *Cede IV* requires that any element of value that is known and susceptible of proof at the time of the merger—even if it would not exist but for the merger—must be included in determining fair value, so long as it is not speculative. In this case it is undisputed that the Concessions were known and susceptible of proof and the time of the merger. Moreover (and de-

spite the Respondent's contrary argument), the Concessions were not speculative, *i.e.*, were not unrealistic or unreliable, since both the nature and amount of the Concessions were specifically defined in a binding written agreement, entered into before the merger date, that spelled out precisely how the Concessions would operate.[17] Thus, the Petitioners conclude, as of the date of the merger, an appraiser seeking to perform a discounted cash flow valuation of Midway that incorporated the Concessions as a basic assumption, could do so with total confidence.

This analysis succeeds, however, only if one uncritically accepts, and does not probe beneath the surface of, a literal argument that coheres only at the verbal level. The difficulty is that even a cursory subsurface probe uncovers factual and legal issues that the Petitioners' analysis ignores. The first is that this case differs markedly from *Cede IV*. That case involved a two-step acquisition where the acquiror became a majority stockholder in the first step, and then began implementing its business plan before concluding the second-step merger. In those quite different circumstances the *Cede IV* Court held that the Perelman Plan was, in fact, an "operative reality" as of the merger date, and that as a legal matter any value attrib-

utable to that Plan was necessarily part of the corporation's going concern value.

The second problem that the Petitioners gloss over is that here the Concessions, although agreed to before the merger, could not and did not become legally effective until after the merger closed. Unlike the Perelman Plan in *Cede IV*, the Concessions were not being implemented—and thus were not an "operative reality"—as of the merger date. On that date the only "operative reality" was that the parties had entered into a contract which provided that the Concessions would become operative if and when the merger closed. This factual distinction the Petitioners do not address, except to argue that it does not matter because all that *Cede IV* requires is that as of the merger date the Concessions be known, susceptible of proof, and nonspeculative.

Petitioners' interpretation of *Cede IV* is analytically unsatisfactory, however, because (i) *Cede IV* does not hold that those criteria are the *only* requirements for a business plan to qualify for consideration as an element of statutory fair value; and (ii) the argument does not face up to the critical factual differences that distinguish this case from *Cede IV*; and (iii) the Petitioners make no reasoned effort to explain

---

**17.** The Respondent argues that the Concessions were speculative, citing *Grimes v. Vitalink Communications Corporation*, Del.Ch., C.A. No. 12334, 1997 WL 538676, Chandler, C. (Aug. 26, 1997), *aff'd*, Del.Supr., 708 A.2d 630 (1998). But *Grimes* shows precisely why the Concessions were not speculative. At issue in *Grimes* was a two-year revenue forecast upon which the plaintiff relied as evidence of the corporation's fair value under 8 *Del. C.* § 262. Chancellor Chandler held that the forecast was impermissibly speculative and not appropriate for use in a § 262 appraisal proceeding, because the forecast was based upon projected sales of a product that at the time of the merger the corporation neither owned nor had the ability or right to provide.

That is, the forecast was speculative because its factual basis was nonexistent. The Court distinguished that forecast from the Perelman Plan in *Cede IV*, which on the date of the merger was a known, operative reality.

Here, too, the Concessions were not speculative, because (unlike the forecast in *Grimes)* they had a basis in reality, namely, a legally binding agreement entered into among all of the interested parties. But, the fact that the Concessions were *not speculative does not* solve the Petitioner's problem in this case. Although the Concessions were an "operative reality," they were not an operative reality *as of the date of the merger;* and indeed, as more fully discussed *infra,* could not become operative until after the merger became effective.

why, in terms of policy, economics, or equity, that distinction should not be accorded legal significance. Put another way, the Petitioners' analysis works only if one accepts uncritically their legal interpretation of *Cede IV* that any element of value, whether or not operative on the date of the merger, must be included in the calculus of fair value, as long as on the merger date it was known, susceptible of proof, and not speculative. In the end I reject that literalistic interpretation, because in my view it subverts what the Supreme Court was seeking to accomplish in *Cede IV*.

## B. The Respondent's View of *Cede IV*

The Respondent implicitly acknowledges that the Petitioners' argument raises unanswered questions. The Respondent also takes sharp issue with the Petitioners' interpretation of *Cede IV*. Unfortunately, however, the Respondent's counter-interpretation also misses the mark, not because of the result it reaches, but because it rests upon a legal view of *Cede IV* that is unsupported by the Opinion in that case.

As noted, the Respondent's position is that for an acquiror's business plan to be considered as a cognizable element of value for § 262 purposes, the acquiror must have the power unilaterally to implement or effectuate the plan before the merger. Otherwise, the Respondent argues, the plan cannot be considered as part of the "operative reality" of the corporation being appraised as of the date of the merger.

A virtue of this position is that it identifies a key factual distinction between this case and *Cede IV*. The argument falls short, however, because it attempts to elevate that factual distinction into a legal doctrine. Ultimately this effort fails, because *Cede IV* neither articulates nor stands for the legal proposition that for a

business plan to be regarded as a cognizable element of "fair value" the acquiror must have had the power to implement the plan before the merger. Although that interpretation does identify a key factual distinction between this case and *Cede IV*, and although that distinction reflects one element or ingredient of the rule for which *Cede IV* (in my view) does stand, the Respondent's interpretation falls short of accurately expressing that rule.

For all these reasons, the essential question—what is the correct application of *Cede IV* in these unique circumstances—persists. What follows is the Court's best effort to address and resolve that question.

## C. *Cede IV* Correctly Understood

The proper starting point, in my opinion, is the basic legal premise that the Supreme Court itself deemed applicable to the facts in *Cede IV*. The Court stated:

> In a two step merger, to the extent that value has been added following a change in majority control before [a] cash-out [merger], it is still value attributable to the going concern, *i.e.*, the extant "nature of the enterprise," on the date of the merger.... The dissenting shareholder's proportionate interest is determined only after the company has been valued ... on the date of the merger. Consequently, value added to the going concern by the "majority acquiror," during the transient period of a two step merger, accrues to the benefit of all shareholders and must be included in the appraisal process on the date of the merger.[18]

Thus, in the two-step acquisition at issue in *Cede IV*, the critical inquiry was whether the majority acquiror, after acquiring control, had "added value" to the going concern before the date of the merger.

18. *684 A.2d at 298–99* (internal citations omitted).

The Court found that to the extent the implementation of the Perelman Plan added value, that value had to be included in the appraisal determination, because it existed, and had accrued to the benefit of all stockholders, as of the date of the merger.

■ How is that holding properly applied to the quite different circumstances of this case? Here the acquisition occurred in one step, not two, and on the date of the merger the Concessions did not exist. Again, the appropriate *Cede IV* inquiry must be whether on the date of the merger the acquiror had "added value" to Midway as a going concern by reason of the Concessions. To that question the answer must clearly be no, because the *Cede IV* Court recognized that the value of the Perelman business plan as of the merger date consisted of its actual implementation, not simply its existence on paper. Here, as of the merger date, the Concessions existed only on paper and were not being implemented. Nor could they be, because the parties to the merger agreement had contracted that the Concessions would not become legally operative until after the merger closed.

■ Thus, the Petitioners' position is flawed because it presupposes that an acquiror's business plan adds value to the acquired corporation's going concern value on the merger date simply because it exists. *Cede IV* does not so hold. Rather, *Cede IV* teaches that the value added by an acquiror's business plan becomes cognizable in an appraisal proceeding only if it is actually being implemented. That reading of *Cede IV* also exposes the incomplete character of the Respondent's argument that the company or the persons controlling it must have the power to implement the plan as of the merger date. To be sure, those persons must have the "power to implement" the plan, but that alone is not enough. What is also legally essential, for the business plan to be included in the appraised company's going concern value, is that as of the merger date that power has been exercised. Because Midway and its controlling stockholder neither possessed nor exercised the legal power to implement the Concessions on or before the merger date, the inescapable conclusion is that any value attributable to the Concessions cannot be considered as part of Midway's going concern value for 8 *Del. C.* § 262 appraisal purposes.

\* \* \*

The construction of *Cede IV* arrived at here is compelled not only by dint of careful parsing of the Supreme Court's Opinion, but also, and more fundamentally, because of considerations of economic fairness. In *Cede IV,* the acquiror was implementing its business plan at the time of the merger. In so doing, the acquiror had subjected the corporation's minority stockholders to the economic risks that plan posed. Economic fairness dictated that if the minority had to bear the risk, then they should also be entitled to enjoy the rewards. Any other result would force the minority to bear their proportionate share of the downside risk, yet allow the majority stockholder to enjoy 100% of the upside reward, attributable to the plan. *Cede IV* proscribes that result.

Those same fairness considerations compel the opposite result in this case. Here the minority shareholders bore none of the economic risk of the Concessions as of the merger date. Instead, for contractual reasons all the downside risk was to be borne—and all the upside reward enjoyed—by the new acquiror (GoodAero) and the former majority stockholder (Z/C). The Concessions had no value in the Company that existed immediately before the merger, and any value the Concessions might have would exist only if and after

the merger occurred. Unlike *Cede IV*, where the new value was contributed *premerger* by the acquiror, here the new value was contributed *post-merger* by both the acquiror and the former majority stockholder. In these circumstances, § 262(h) and *Cede IV* proscribe the inclusion of the new value (the Concessions) in determining the fair value of Midway at the time of the merger.

Although that result is legally required as a matter of statutory appraisal law, it does not follow that Midway's former minority stockholders are left without a remedy. Any remedy, however (assuming that the plaintiffs demonstrate their entitlement to it), would be granted in the companion fiduciary action, but not in this statutory appraisal proceeding.[19]

## IV. CONCLUSION

For the above reasons, judgment shall be entered against the Petitioners and in favor of the Respondents in this proceeding. Counsel for the parties shall submit a form of order that implements the ruling in this Opinion.

---

**19.** The Petitioners' position in this proceeding appears to be driven by the fact that in only one year or so after the merger, Z/C sold its 22% minority interest in the newly merged Midway for over $27 million, whereas the minority, which had been cashed out for only a penny per share, never had an opportunity to own equity in the new company. To the extent that is the basis for the Petitioners' grievance, their recourse would be a claim against Z/C for wrongfully allowing the minority shareholders to be excluded from the opportunity to participate in the new enterprise. In making this observation, the Court intimates no view as to the merits of any such claim. Indeed, it should be noted that Z/C did not obtain the opportunity to participate (and to enjoy any "upside" potential appreciation in its investment) without cost. Z/C was required to forgive a significant portion of Midway's indebtedness to it, and also to surrender over 75% of its equity position in the pre-merger Midway. Rather, this observation is made solely to point out that if in the companion action the minority stockholders are able to show that Z/C's conduct amounted to a breach of fiduciary duty, they would be entitled to a remedy in that action. Any such remedy, however, would flow from the fiduciary nature of the relationship between Z/C and the minority stockholders, based upon common law precepts that are different from the principles that govern this statutory appraisal.